664 F.2d 971
 9 Fed. R. Evid. Serv. 970
 UNITED STATES of America, Plaintiff-Appellee,
v.
Mark Steven PHILLIPS and Richard Elliott Grant, Jr.,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Jay MEINSTER, a/k/a "Robby", Eugene Arter Myers,
a/k/a "Big Gene", Richard Elliott Grant, Jr., Randall Gene
Fisher, Modesto Echezarreta-Cruz, Robert Elliot Platshorn,
a/k/a "Roger Culpepper", Defendants-Appellants.
 Nos. 79-3189, 80-5320.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Dec. 28, 1981.
 John F. Brown, Jr., Miami, Fla., Dana D. Biehl, Marvyn Hamburg, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.
 Dennis Cogan, Philadelphia, Pa., for Meinster.
 Rebekah J. Poston, Theodore Klein, Miami, Fla., for Myers.
 Samuel Sheres, Hollywood, Fla., for Fisher.
 Geoffrey C. Fleck, Miami, Fla., for Echezarreta-Cruz.
 Thomas G. Murray, Miami, Fla., for Robert Elloit Platshorn.
 Appeals from the United States District Court for the Southern District of Florida.
 Before FRANK M. JOHNSON, Jr., and HATCHETT, Circuit Judges, and SCOTT,** District Judge.
 FRANK M. JOHNSON, Jr., Circuit Judge:
 
 
 1
 Appellants were members of a marijuana smuggling organization which called itself the "Black Tuna" enterprise. The Black Tuna group imported on a massive scale. According to statements by one appellant, during the period from October 1976 to shortly after September 1977, one of the four years covered by the indictment, the Black Tuna group successfully imported into the United States over one million pounds of marijuana.
 
 
 2
 Twelve defendants were charged in a one-hundred page superseding indictment containing thirty-six counts. The superseding indictment covered the period from August 1974 to April 1978. Following a lengthy jury trial appellants were convicted of violating the racketeering statute, 18 U.S.C.A. § 1962(c) and (d); the travel act, 18 U.S.C.A. § 1952; and federal drug laws, 21 U.S.C.A. §§ 841(a)(1), 843(b), 848, 952, and 963. Four of the appellants were acquitted on some of the counts charged against them.[1] Appellants received substantial sentences.[2]
 
 
 3
 The trial in this case was extraordinary in several respects. Because of the extent of Black Tuna's importation and distribution of marijuana, the trial, which lasted from September 1979 to February 1980, received extensive publicity. The publicity was intensified on December 6 when the Government announced that two separate indictments were to be returned that day: one against appellant Fisher for bribing a juror, and another against several of the defendants charging them with conspiracy to obstruct justice. The obstruction of justice indictment alleged that those charged had plotted to disrupt the proceedings and to assassinate the trial judge. The trial court then sequestered the jury during the week of December 6-13, 1979.
 
 
 4
 The trial court also found it necessary to substitute three alternate jurors for regular jurors. First, the juror who was implicated in the bribery charge was replaced. Another regular juror was later replaced by a substitute juror after she revealed that she had inadvertently learned that an indictment had been returned against a juror. Finally, after the jury had been deliberating for a day and a half, one juror suffered a heart attack. The trial court, over defense objections, substituted an alternate after receiving assurances from the jurors who had deliberated that they could and would erase from their minds their past deliberations and start anew.
 
 
 5
 Appellants raise numerous contentions on appeal.[3] After careful examination of each of these arguments,[4] we conclude that all of appellants' convictions should be affirmed, except for Echezarreta's racketeering conviction.
 
 I. THE BLACK TUNA ENTERPRISE[5]
 
 6
 In August 1974 Lucas McLeod arranged with appellant Platshorn to ship a load of marijuana from Florida, where they resided, to appellant Meinster in Philadelphia, where he operated two dress shops which he used as fronts for his marijuana dealing. In October 1974 McLeod had 2000 pounds of marijuana trucked to Meinster in Philadelphia. One of McLeod's employees, a podiatrist named Dr. Morris Keller, was the truck driver on that occasion. Keller was also a government witness at trial. Meinster paid McLeod approximately $700,000 in installments. McLeod did not pay a brokerage fee to Platshorn because Platshorn disclosed that he was Meinster's partner.
 
 
 7
 McLeod later delivered two additional loads of marijuana, one of 2000 and another of 4000 pounds at $275 per pound, to Meinster in Philadelphia. McLeod informed Platshorn of the size of each of those shipments to Meinster. After the third delivery to Philadelphia, Platshorn instructed McLeod to deliver future shipments to Platshorn's residence in Miami. Two such deliveries, one of 2000 and another of 3000 pounds, were made in 1975 although Platshorn rejected the second delivery because he believed the marijuana to be of inferior quality.
 
 
 8
 The source of McLeod's marijuana was co-conspirator Raul Davila, a Colombian resident. Platshorn later acquired marijuana from sources other than McLeod; among them were members of the Miami Cuban community.
 
 
 9
 In the late spring of 1976 Platshorn leased property in Miami for the purported purpose of operating an automobile auction business. The auction was in fact intended to be a cover for the marijuana importation and distribution activities of Meinster, Platshorn and others. The auction business constantly lost money-up to $4000 weekly. Keller was hired to work at the auction, ostensibly as a general manager. Keller's actual primary responsibility was to supervise the loading of the marijuana that was stored at the auction site into customers' vehicles parked at the auction or on occasion at Platshorn's residence. Marijuana was also placed in vehicles that were delivered to customers; one such customer was appellant Myers.
 
 
 10
 In June 1976 Platshorn hired Raymond Jiminez as the comptroller for the auction. Jiminez was a central government witness at trial. Numerous marijuana transactions were completed in Platshorn's office at the auction. Jiminez became acquainted with a number of persons, including appellants Myers and Echezarreta, who came to the auction to engage in marijuana transactions.
 
 
 11
 By mid-1976 Platshorn and Meinster had a flourishing importation and distribution business. Appellant Fisher worked as a pilot for vessels which offloaded marijuana from mother ships on the high seas and delivered it to American shores. Fisher allegedly received $100,000 for each such pilotage effort made for the Platshorn-Meinster enterprise. Appellant Grant worked for Platshorn and Meinster as a security chief in charge of protecting the cargos of marijuana. Most of the enterprise's marijuana, until the summer of 1976, was obtained from a Latin-American organization based in Miami.
 
 
 12
 In the fall of 1976 Platshorn went to Colombia and personally arranged with Davila to import marijuana directly from Colombia. The cost for obtaining the marijuana was approximately $60 per pound. The first shipment, totalling 1100 pounds, was delivered directly from Davila to the auction in the fall of 1976. Delivery preceded Platshorn's return from Colombia; after Meinster forwarded payment for the shipment, Platshorn was able to leave Colombia.[6]
 
 
 13
 Davila and the others used the code phrase "Black Tuna," spoken in English or Spanish, as the signal for arriving aircraft in Colombia or for vessels rendezvousing with Davila's cargo ships on the high seas. Davila himself was referred to as the Black Tuna and eventually the enterprise came to be known as Black Tuna. Platshorn even distributed to the organization's members a medallion in the form of a dark-colored fish, worn around the neck.
 
 
 14
 The initial 1100-pound shipment was only a portion of the shipment that Davila had set aside for the Black Tuna organization. Platshorn, Myers, Keller and others arranged to send a plane to Colombia for the balance of the marijuana. Myers offered to furnish manpower to unload the plane after it landed at the Punta Gorda Airport near Fort Myers, Florida. Myers also indicated that for a payment of $10,000 he could keep the airport manager away while the unloading took place. By happenstance, the airport manager was not on duty when the plane arrived. Myers also stated that he wished to purchase any marijuana exceeding the amount designated for a particular customer. The plane landed on November 5, 1976; Keller supervised the successful unloading of approximately 3800 pounds of marijuana. The plane was abandoned because of engine trouble and was discovered the following day by law enforcement officers.
 
 
 15
 Meinster moved to Miami in early 1977. The enterprise at that time owned several yacht-sized vessels and operated out of several locations, including a suite in the Fontainebleau Hotel. In January 1977 Jiminez went to that suite to deliver a car to Myers. Upon entering the suite Jiminez saw Platshorn, Meinster, Myers, and other Black Tuna members. Large stacks of money covered a table. After asking Jiminez whether he had ever seen so much money, Myers remarked that "It is not all ours yet, so don't worry about it." The Black Tuna members apparently did not hesitate to fully avail themselves of the Fontainebleau's room service; Jiminez testified that Platshorn told him that the room service bill from October 1976 to April 1977 was $66,000.
 
 
 16
 The enterprise used several vessels for offloading marijuana and could recycle vessels after their use because co-defendant Phillips sold boats in Fort Lauderdale. The enterprise used luxury craft rather than shrimping trawlers or other such vessels in order to attract less suspicion.
 
 
 17
 The Fontainebleau suite was the Black Tuna headquarters until March 1977. In April 1977 Platshorn obtained a houseboat, called BEAM'S POST TIME, which was moved into waters adjacent to the Fontainebleau, where it became the new headquarters, complete with a phone line hookup with calls being handled through the Fontainebleau's main switchboard.
 
 
 18
 Platshorn, Meinster and Myers also obtained interests in or established other businesses, one of which was Land-Air which leased a private airstrip at the St. Petersburg-Clearwater Airport. Two of the planes kept on that airstrip belonged to Platshorn and Meinster. Myers was in charge of the Land-Air venture, which served as a cover for Black Tuna pilots.
 
 
 19
 In February 1977 Platshorn asked a real estate agent, Lawrence Richter, to locate waterfront homes or warehouses that could serve as "stash houses." That same month a suitable house, with direct ocean access, garage facilities and no close neighbors, was located on San Marino Drive and was leased under a fictitious name. The house was used successfully several times for shipments of marijuana imported by Fisher.
 
 
 20
 In April 1977 Fisher made another delivery to the house but one of the Black Tuna members rejected the marijuana as inferior. Platshorn directed Echezarreta, the broker of the transaction, to remove the marijuana within 24 hours. Grant was to provide security until Echezarreta could locate another buyer. That same day the owner of the house telephoned Richter and informed him that she was sending a carpenter to the house. Richter in turn informed Platshorn and then went to the house where he saw marijuana stacked almost to the ceiling in the living room. Richter, at Platshorn's direction, prevented the carpenter from entering the house.
 
 
 21
 That same evening, while Jiminez and Myers were aboard the BEAM'S POST TIME, Myers received a number of phone calls. They went to the Fontainebleau Hotel. At 10:30 p. m. Myers had a phone conversation after which he told Jiminez that he had just advised Meinster that everything was secure at the San Marino house. San Marino was not secure for long, however. About 11:30 p. m. a suspicious neighbor called the police after observing cars and a large truck arrive at the San Marino house. Echezarreta had located a buyer for part of the marijuana, who decided to take possession at night rather than to heed Platshorn's advice to remove the marijuana during late-afternoon rush-hour time when less attention would be attracted to the loading. Upon their arrival at the house, police officers saw bundles of marijuana in the truck which was parked in the driveway and smelled marijuana from within the house. The police entered the house, arrested the occupants who had not fled, and seized 16,000 pounds of marijuana. Grant and Echezarreta escaped arrest but one of Grant's associates named Verdi did not. The next day Jiminez obtained a list of the persons arrested and phoned Meinster, who told him to obtain Verdi's release on bond because he was Grant's assistant. Because of the presence of law enforcement officers at the marina where the yacht used by Fisher to deliver the marijuana to the San Marino house was being kept, Platshorn allegedly sank the yacht.
 
 
 22
 The Black Tuna enterprise remained intact after the San Marino setback. In May 1977 Platshorn obtained a new waterfront property suitable for smuggling. Platshorn told Jiminez while showing him the house in June that he had used that house for storing marijuana and that 20,000 pounds had been moved in and out of the house in less than ten days. Jiminez at that time observed five or six boxes which Platshorn described as the remains of the 20,000 pound operation.
 
 
 23
 Other businesses collateral to the Black Tuna marijuana enterprise were planned or established. One such business was formed in order to send cars to Davila in Colombia; a Cadillac was sent in July 1977. In December 1977 Myers asked Jiminez if he could obtain a mortgage under fictitious names for certain property to be used for growing marijuana. That proposed deal was to be handled by the Green Turtle Construction Company.
 
 
 24
 In July 1977 co-defendant Phillips invited a friend from North Carolina, George Purvis,[7] to meet with Platshorn in Florida. Upon meeting Purvis, Platshorn revealed that he planned to import 40,000 pounds of marijuana on Labor Day and that he preferred to import into North Carolina rather than into Florida. Purvis agreed to find a suitable location. When he returned to North Carolina, Purvis was informed that the vessel to be used by the Black Tuna organization was the PRESIDENTIAL, an 85-foot yacht that Platshorn had purchased from Phillips for $250,000 in cash. Purvis obtained North Carolina registration papers in a fictitious name for the PRESIDENTIAL and sent the papers to Phillips. Phillips revealed to Purvis that the Black Tuna organization had an income of about $12,000,000 the previous year, that it owned five vessels, and that it was capable of monitoring Drug Enforcement Administration broadcasts.
 
 
 25
 In late August Platshorn and Phillips met Purvis in North Carolina and selected a landing site from the alternative sites that had been chosen by Purvis. Platshorn confirmed Phillips' statement regarding earnings of $12,000,000 the past year from the smuggling operation. Purvis obtained trucks and workers for the offloading.
 
 
 26
 Myers organized the crew for the voyage of the yacht the PRESIDENTIAL, which was his first transaction as a full partner in the Black Tuna organization. Fisher and Echezarreta had each refused to serve as captain of the vessel. After taking on 36,000 pounds of marijuana on the high seas, the PRESIDENTIAL went aground near Great Abaco Island in the Bahamas. Water had entered a porthole that had been opened by a crew member who had overindulged in his use of cocaine, and the bilge pumps had failed to work.
 
 
 27
 Black Tuna members made several efforts to retrieve the marijuana from the PRESIDENTIAL. Grant flew to Abaco intending to drop a new bilge pump, but he was unable to make the drop. Fisher was dispatched aboard the BIG GLO II with directions from Platshorn to recover as much marijuana as possible from the PRESIDENTIAL. Fisher removed several bales in one attempt. In a later attempt on September 3, Fisher and two accomplices were foiled by four Bahamian police officers who were concealed inside the PRESIDENTIAL. Fisher and his accomplices returned to the BIG GLO II, which later struck a reef as it fled. Its crew was seen discarding bales into the water. Fisher later told Jiminez that he had rescued two bales and showed him some marijuana which he said came from those two bales.
 
 
 28
 The Black Tuna organization lost $1 million in the PRESIDENTIAL incident. A search of the PRESIDENTIAL revealed 745 bales of marijuana, a receipt for the BIG GLO II, and papers relating to the Green Turtle Construction Company.
 
 
 29
 In September 1977 Meinster and Purvis made plans to deliver marijuana from Davila's vessel, the mothership DON ELIAS, to North Carolina. Purvis contacted Wade Bailey, captain of the OSSPREY,[8] about obtaining a vessel for performing the transfer from the DON ELIAS on the high seas. Bailey was a confidential informant for the government. Purvis suspected that Bailey was an informant but needed the OSSPREY because Purvis' own vessel had been damaged on a trial run in preparation for the importation via the DON ELIAS. Meinster advised Purvis to double Bailey's payment to $100,000, believing that the government could not meet that price. Grant had another suggestion: "shoot him." Grant rented a building for storage of the marijuana.
 
 
 30
 After the OSSPREY took on a cargo of marijuana from the DON ELIAS on the high seas, the DON ELIAS was seized by federal authorities. Purvis' associates were arrested but Purvis fled to Florida where he lived for a time on the BEAM'S POST TIME.
 
 
 31
 As the result of a drug deal arranged by Jiminez, in which Echezarreta was the broker, a financial dispute between Echezarreta and some of his Colombian clients arose. Myers informed Jiminez that he had learned of a "rip-off" in the deal and that Echezarreta would be required to answer to certain Colombians for the loss. As a result of the incident Platshorn and Myers stopped speaking to each other for a time. Also, Platshorn criticized Echezarreta concerning the deal.
 
 
 32
 Shortly thereafter Platshorn fired Jiminez as comptroller of the auto auction and Jiminez went to work for Myers in his lobster business on the west coast of Florida. Myers' active participation in the Black Tuna organization diminished although he continued to operate Land-Air. Additionally, in December 1977 Myers succeeded in resolving the financial dispute between Echezarreta and the Colombians.
 
 
 33
 On January 2, 1978, a courier of a smuggler from Tampa who had just imported 40,000 pounds of marijuana came to Platshorn's house with a sample, a 50-pound bag. Platshorn and Purvis inspected and sampled the marijuana. Platshorn found it to be acceptable in quality and purchased that bag but declined to buy the remainder of the load because he felt that he had been insulted by the courier's demand for immediate payment.
 
 
 34
 In January 1978 Grant, Purvis and Platshorn arranged several unsuccessful attempts to import marijuana directly from Davila in Colombia. On one occasion Purvis and two crew members flew to Colombia where they contacted Davila. After Purvis returned from Colombia he surrendered to federal authorities and thereafter agreed to cooperate with DEA agents. Purvis then went to work at the auction. In March 1978 Purvis again flew to Colombia to retrieve two Black Tuna pilots who had been ransomed from the army by Davila.
 
 
 35
 The numerous issues presented upon this appeal will be discussed in what we consider to be an orderly sequence.
 
 
 36
 II. REPLACEMENT OF A JUROR AFTER DELIBERATIONS BEGAN[9]
 
 
 37
 After giving the instructions to the jury, the trial court discussed with counsel procedural options in the event that a juror became incapacitated after deliberations had begun. Defense counsel unanimously stated that they would refuse to stipulate to a jury of less than twelve. See Fed.R.Crim.P. 23(b). They also objected to a proposal that an alternate juror might be impaneled if a regular juror became unable to continue. Despite defense objection, the court ordered that the remaining alternate juror, Mr. Lewis, not be dismissed but rather that he be separately sequestered while the regular jurors deliberated.[10] Lewis was directed not to watch television newscasts.
 
 
 38
 The jury began deliberations on a Friday and deliberated from 9:30 a. m. until 4:30 p. m. The following day the jurors deliberated from 9:30 a. m. until approximately 2:30 p. m., when they asked to return to the hotel because one juror, Mr. Zalc, felt ill. At one point during the jury's deliberations the foreman requested that some trial testimony be made available to the jury. Before the court had decided whether to allow the jury to review the requested testimony, the foreman indicated that several jurors recalled several incidents which helped them remember the requested testimony and stated that "this probably will make us look at other testimony with a greater insight." Mr. Zalc was hospitalized on Sunday and on Monday suffered a heart attack. The court thus found it necessary to excuse Zalc from further jury service.
 
 
 39
 On Tuesday the court decided to replace Zalc with Lewis. Before the court decided to impanel Lewis, it questioned Lewis and the remaining jurors. The court first questioned Lewis and received his assurances that he had neither discussed the case with anyone nor received any extrinsic information about it. Lewis also assured the court that he would have no difficulty working with the other jurors from a clean slate. The court summoned the other jurors to the courtroom, informed them of the events, and ordered that all materials upon which they had written during deliberations be confiscated. The court then sent the jury out of the courtroom and ordered that the jurors return individually for questioning. Although the court did not ask the jurors whether they had either personally or collectively arrived at opinions or conclusions about any of the charges or defendants,[11] the court did ask each juror whether he or she could and would wipe from his or her mind the deliberations of the two previous days and start fresh and anew. Each juror gave the court that assurance. The court then instructed the jury on its duty to start its deliberations anew.[12] After Lewis was impaneled a foreman was again elected and the jury deliberated for six days until reaching a verdict.[13]
 
 
 40
 Appellants urge that the action of the trial court in impaneling an alternate after jury deliberations had begun was reversible error. They object to the action on both constitutional grounds, as violative of their right to a trial by a fair and impartial jury under the Sixth Amendment,[14] and statutory grounds, as violative of Fed.R.Crim.P. 24(c).
 
 
 41
 Initially, we agree with the Government's position that the language of Rule 24(c) concerning substitution of alternate jurors prior to the jury's retirement is not constitutionally mandated. See Henderson v. Lane, 613 F.2d 175, 179 (7th Cir.), cert. denied, 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980) (state trial court substitution of alternate juror after regular juror suffered heart attack held not to violate defendant's right to trial by jury under Sixth and Fourteenth Amendments). Cf. People v. Collins, 17 Cal.3d 687, 552 P.2d 742, 131 Cal.Rptr. 782 (1976), cert. denied, 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977) (substitution of alternate juror after jury deliberations have begun permissible under California constitution); but cf. People v. Ryan, 19 N.Y.2d 100, 224 N.E.2d 710, 278 N.Y.S.2d 199 (1966) (New York constitution prohibits substitution of alternate after jury deliberations have begun.[15] See also United States v. Evans, 635 F.2d 1124 (4th Cir. 1980) (no fundamental unfairness in replacing regular juror with alternate after jury deliberations had begun where defendant agreed to such replacement).[16] The California Supreme Court held, with reference to its own state constitution, that "the right to trial by jury does not require a declaration of a mistrial when a properly qualified alternate juror is available and that juror fully participates in all of the deliberations which lead to a verdict." People v. Collins, supra, 131 Cal.Rptr. at 786, 552 P.2d at 746. The court found no constitutional objection to substitution of an alternate after deliberations have begun where good cause has been shown for the dismissal and the jury has been instructed to begin its deliberations anew. Id.[17] We believe that such reasoning is applicable to the federal Constitution and disposes of appellants' constitutional argument.[18]
 
 
 42
 Appellants' second challenge to the substitution of the alternate after deliberations had begun is based on Fed.R.Crim.P. 24(c), which provides in pertinent part:
 
 
 43
 Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties .... An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.
 
 
 44
 Appellants urge that the district court's substitution of the alternate, in violation of the language of Rule 24(c), is reversible error. In evaluating appellants' argument we are guided by the Supreme Court's statement in Fallen v. United States, 378 U.S. 139, 142, 84 S.Ct. 1689, 1691, 12 L.Ed.2d 760 (1964), that the Federal Rules of Criminal Procedure "are not, and were not intended to be, a rigid code to have an inflexible meaning irrespective of the circumstances." See United States v. Mendoza, 565 F.2d 1285, 1289 (5th Cir.), rehearing en banc, 581 F.2d 89 (5th Cir. 1978) (adopting relevant portion of panel decision). The question before this Court is whether the appellants were prejudiced by the substitution of the alternate after jury deliberations had begun. We conclude that they were not because the procedural precautions taken by the trial court obviated the danger of prejudice to the appellants and overcame the concerns of the draftsmen of Rule 24(c).
 
 
 45
 The present language of Rule 24(c) is little changed from a preliminary draft prepared in February 1944. 3 L. Orfield, Criminal Procedure Under the Federal Rules 94 (1966). The draftsmen had previously considered and discussed the restriction against substituting an alternate once deliberations have begun. Id. at 94, 98; Orfield, Trial Jurors in Federal Criminal Cases, 29 F.R.D. 43, 46, 53 (1961). A preliminary draft dated May 1942, which contained a proposed rule that would have allowed substitution of an alternate juror after the jury retired for deliberations, was submitted to the Supreme Court for comment. The Court queried the rules committee whether the committee had satisfied itself that such a procedure would be desirable or constitutional. Orfield, Trial Jurors in Federal Criminal Cases, supra, 29 F.R.D. at 46. The draftsmen of the rules committee did not adopt that proposed rule. It was feared that if such substitutions were permitted "(t)he members of the regular jury might bring such influence on a dissenter as to disable him and then require an alternate. The alternate may have been exposed to improper influences before he takes part as he does not previously sit in the jury room." 3 Orfield, Criminal Procedure Under the Federal Rules, supra, at 94.
 
 
 46
 In addition to those proposals presented to the draftsmen of Rule 24(c) which would have permitted substitution of alternates during deliberations, subsequent proposals have been made that Rule 24(c) be amended to permit such substitutions. Supplemental Report of Committee on Federal Rules of Civil Procedure-Judicial Conference-Ninth Circuit, 37 F.R.D. 71, 74 (1965) (advocating substitution of alternates in protracted trials after case submitted to jury); Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure, Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (1973) (quoted in United States v. Lamb, 529 F.2d 1153, 1162 n.7 (9th Cir. 1975) (dissenting opinion)) (advocating substitution of alternate after deliberations have begun; would also require that "the court shall advise the entire jury that all facts shall be reviewed and discussed with the juror who has previously served as an alternate juror"); Paisley, The Federal Rule on Alternate Jurors, 51 A.B.A.J. 1044 (1965).
 
 
 47
 Some states have adopted statutory criminal rules provisions allowing substitution of an alternate juror after deliberations have begun. E. g., Cal.Pen. Code § 1089 (West); see Paisley, The Federal Rule on Alternate Jurors, supra, 51 A.B.A.J. at 1045. See generally Annot., 84 A.L.R.2d 1288 (1962). However, the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury § 2.7 (Approved Draft 1968), rejected such substitution provisions. The ABA Advisory Committee on the Criminal Trial believed that it was undesirable to substitute a juror who had not had the benefit of prior deliberations. Id. § 2.7 at 83.
 
 
 48
 The initial decision by the district court in this case not to discharge the alternate Lewis when the jury retired was a violation of the language of Rule 24(c) which provides that an alternate who does not replace a regular juror shall be discharged after the jury retires to deliberate. This Court, however, does not apply a per se rule of reversal to Rule 24(c) violations. United States v. Allison, 481 F.2d 468, 472 (5th Cir.), aff'd after remand, 487 F.2d 339 (5th Cir. 1973), cert. denied, 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974); accord, United States v. Hayutin, supra, 398 F.2d at 950. Admittedly, that provision of Rule 24(c) has been held by this Circuit to be "a mandatory requirement that should be scrupulously followed." United States v. Allison, supra, 481 F.2d at 472; accord, United States v. Hayutin, supra, 398 F.2d at 950; United States v. Lamb, supra, 529 F.2d at 1156. Despite the mandatory language of Rule 24(c), however, this Court in United States v. Allison, refused to hold that any departure from the rule automatically required a new trial. The Court held that a new trial would not be required unless there was a reasonable possibility that the presence of the alternate affected the jury's verdict. 481 F.2d at 472. In Allison the trial court did not discharge an alternate juror when the jury retired, but rather permitted the juror to sit in the deliberation room with the regular jurors although he was directed not to participate in any way. This Court remanded the case for an evidentiary hearing on the possibility that the jury's verdict was affected. The district court's subsequent finding was affirmed on appeal. 487 F.2d 339.[19]
 
 
 49
 Other technical violations of Rule 24(c) have been held not to be reversible error. In United States v. Cohen, 530 F.2d 43, 48 (5th Cir.), cert. denied, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976), this Court sanctioned the replacement of a regular juror by an alternate after the jury had been ordered to retire for deliberations, but before actual deliberations had commenced. Replacement of a disabled juror after deliberations have begun has been approved if the defendant stipulates to such substitution. United States v. Evans, supra, 635 F.2d 1124; Leser v. United States, 358 F.2d 313, 317 (9th Cir.), petition for cert. dismissed, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966). Failure to discharge alternate jurors, if the alternates had been separated from the jury while deliberating and at no time had been in contact with the deliberating jury, has been held not to be prejudicial, reversible error under Rule 24(c). United States v. Hayutin, supra, 398 F.2d 944.
 
 
 50
 Appellants rely upon United States v. Lamb, supra, 529 F.2d 1153, in which the Ninth Circuit, sitting en banc, reversed a conviction on the ground that the district court failed to comply with the plain requirements of Rule 24(c). Lamb, however, is clearly factually distinguishable from the present case. The trial court in Lamb initially directed an alternate to "stand by" in case she was needed, but then discharged her when the jury returned a verdict of guilty after four hours of deliberation. The court, however, refused the verdict because it was inconsistent with the instructions. The court recalled the alternate and impaneled her in the place of another juror who had requested to be excused. The court then reinstructed the jury and told it to begin its deliberations anew. The newly constituted jury returned a guilty verdict after only twenty-nine minutes of deliberation. After the final verdict was returned, the court sought and received assurances from the jury foreman and the alternate who had been substituted that the jury had begun deliberations anew and had discussed all the points of evidence. Id. at 1158.
 
 
 51
 The brief amount of time in which the second verdict was reached demonstrated to the appellate court that the alternate was impermissibly coerced and that the newly constituted jury did not give conscientious, careful reconsideration to the case despite the trial court's instruction that it begin anew. Id. at 1156. However, the Lamb court's reversal of the conviction was apparently based on the mere fact that the mandatory provision of Rule 24(c) was violated; the court stated that the length of deliberation by the newly constituted jury was "essentially irrelevant." Id. at 1156 n.7.[20] The Ninth Circuit noted some of the reasons underlying Rule 24(c), most significantly the "inherent coercive effect" upon an alternate who joins a jury after it has deliberated for some length of time and the possibility that a juror who disagreed with the other jurors might be coerced into feigning incapacity to continue sitting on the jury. Id. at 1156.
 
 
 52
 The dissenting opinion in Lamb criticized the majority's adoption of a per se rule of reversal and asserted that a determination should be made as to whether violation of the rule was prejudicial to the defendant, citing this Court's decision in United States v. Allison, supra, 481 F.2d at 472, and United States v. Hayutin, supra, 398 F.2d at 950-51. Id. at 1159. The Lamb dissent would not, however, have remanded the case for an evidentiary hearing on the possibility of prejudice, as this Court did in Allison, because the district court had already made the necessary fact finding on the issue of possible prejudice. Id. at 1161. The dissent also stated that there is greater justification for a rule of reversal per se if an alternate is present with the jury during deliberations, since the privacy of jury deliberations is thereby violated, than for such a rule when an alternate is substituted after deliberations have commenced. Id. at 1160, citing Leser v. United States, supra, 358 F.2d at 318.
 
 
 53
 The most substantial concern about substitution of an alternate juror after deliberations have begun is that the alternate might be coerced by jury members who might have already formulated positions or viewpoints or opinions. Here, the trial court after careful consideration utilized a number of procedural mechanisms in order to protect the appellants' rights. The court sequestered the alternate during the preliminary jury deliberations, carefully questioned each juror individually about whether he or she could and would start the deliberations anew, and pointedly instructed the jury to begin its deliberations anew. These extreme precautions, in addition to the continuation of deliberations for an entire week after the alternate was impaneled, negated any possible coercive effect or any undue influence.[21]
 
 
 54
 The safeguards utilized by the court neutralized the possible prejudice to the appellants. We need not remand for an evidentiary hearing on the issue of prejudice, see United States v. Allison, supra, 481 F.2d at 472, because we conclude that the instructions to the jury to begin anew, the jurors' individual assurances that they could in fact begin anew, and the full participation of the substituted alternate in the deliberations, which lasted six days, obviated the danger of undue prejudice. On the record before us we cannot discern that appellants were prejudiced by the substitution. The substitution procedure utilized by the court did not deprive appellants of their right to a full consideration of their cases by an impartial jury panel.
 
 
 55
 We emphasize that the court's decision to substitute the alternate was made in the context of a most complex and protracted trial, lasting over four months, of multiple defendants on numerous substantive and conspiracy charges. Our conclusion that the district court committed no reversible error must likewise be understood as limited to such an exceptional context. We have considered the relief sought by the appellants-a new trial-in light of the purpose of the federal rules of criminal procedure: "to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Fed.R.Crim.P. 2. The district court's substitution procedure secured a just and non-prejudicial result and served to further the purpose of the federal rules of criminal procedure and the administration of justice.
 
 III. OTHER JURY-RELATED ISSUES
 
 56
 On December 6, 1979, the Government moved to sequester the jury because two indictments charging obstruction of justice were to be returned that day against some of the defendants. Appellant Fisher was charged with offering a bribe to a juror. That juror was also indicted as a result of the alleged bribery by Fisher. Other defendants were separately charged with conspiracy to obstruct justice in an indictment which alleged, inter alia, the existence of a plot to disrupt the trial proceedings by killing the trial judge. The trial court ordered the jury temporarily sequestered but did not inform the jury of the reason for the sequestration. The court denied Meinster's counsel's motion to sequester the jury for the remainder of the trial.
 
 
 57
 The following day, after a hearing, the court granted the Government's motions to discharge the juror who was the object of the attempted bribe and to revoke the appearance bonds of certain defendants. The court denied motions by Meinster's counsel to declare a mistrial or to conduct an individual voir dire of the jurors. The court had previously denied Meinster's motion, because of anticipated extended and intense publicity, to exclude the public from the hearing on the Government's motions.
 
 
 58
 Approximately one week later, on December 13, the court, over defense objections, released the jury from sequestration. The court explained to the jury that the reason for the sequestration was to avoid exposing them to certain publicity about matters occurring in the trial out of their presence. From the outset of the trial the court had repeatedly admonished the jury against exposure to media reports of the trial. In discussing with the jurors their release from sequestration, the court asked them whether they had heeded its repeated instruction not to discuss the case among themselves or with anyone else. The jurors nodded affirmatively. The court then asked the jurors for a "solemn pledge" that they would not watch any televised news, listen to the radio, or read the newspaper; each juror gave that pledge.
 
 
 59
 Four days after the jury was released from sequestration one of the alternate jurors was discharged after she informed the court that she had inadvertently learned from a co-worker of an indictment against a juror. She told the court that she had not communicated this information to any other jurors. The court asked the remaining jurors collectively whether any of them had learned of any events occurring during the sequestration period or whether anyone had talked to them about the trial. The jurors responded negatively. The court denied Meinster's counsel's request for an individual voir dire of the jurors. During the remainder of the trial the court continued to seek and receive assurances from the jurors that they had not been exposed to extrinsic information about the case.
 
 
 60
 A. Release of the Jury from Sequestration; Voir Dire of the Jury
 
 
 61
 Appellants contend that the court's release of the jury from sequestration in the midst of considerable local media coverage concerning the trial denied them a fair trial by an impartial jury unaffected by prejudicial publicity. They also maintain that the general or collective voir dire was inadequate.
 
 
 62
 Before a reversal will lie on the ground that the district court erred in releasing the jury from sequestration, appellants must demonstrate a substantial likelihood that some prejudice did result. United States v. Harris, 458 F.2d 670, 675 (5th Cir.), cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972). See United States v. Arciniega, 574 F.2d 931, 933 (7th Cir.), cert. denied, 437 U.S. 908, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978) ("(T) he decision to allow a jury to separate rests within the sound discretion of the district court, and ... for separation to constitute reversible error there must be an objection supported by specific reasons against separation and a showing that the defendant was actually prejudiced by reason of the separation."). The trial court has the discretion to decide whether to allow the jury to separate. Harris, supra, 458 F.2d at 674-75. Whether the trial court admonished the jury to avoid outside influence is a significant factor in determining the likelihood of prejudice.
 
 
 63
 The trial court in this case instructed the jury throughout the trial to avoid exposure to media reports of the trial. The jurors collectively assured the court, both when they were released from sequestration and on subsequent trial days, that they had received no outside information about the case. The court's constant admonitions to the jury concerning media coverage and its collective questioning of the jury were adequate safeguards to ensure that appellants received a fair trial free from prejudice. United States v. Capo, 595 F.2d 1086, 1093 (5th Cir. 1979), cert. denied, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980); United States v. Herring, 568 F.2d 1099 (5th Cir. 1978).[22]
 
 
 64
 An individual, rather than a collective, voir dire concerning the jurors' exposure to publicity occurring during the trial is not required in all cases. United States v. Capo, supra, 595 F.2d at 1093. Whether individual examination of the jurors is warranted depends on a two-step threshold determination by the court: first, whether the material disseminated during the trial is beyond the record and is seriously prejudicial in content and, second, whether there is a likelihood that the material reached the jury. Id. The jurors' negative responses to the collective inquiry in this case adequately demonstrated that none of the jurors was exposed to extrinsic information. See id.[23]
 
 
 65
 We do not commend the trial court's decision to end the sequestration, amidst considerable publicity, after only one week. Indeed, many of the problems at trial, not only the possibility that the extensive prejudicial publicity would come to the attention of the jurors but also the problem of the tampered-with juror, could have been eliminated had the court sequestered the jury from the beginning of the trial.[24] Nevertheless, we do not conclude that the trial court's actions constituted prejudicial, reversible error.
 
 B. Allegation of a Contaminated Jury
 
 66
 In a tape-recorded conversation between Fisher and a government agent, Fisher, who was charged with bribing a juror, claimed that the bribed juror had discussed the case with other jurors. Fisher, in that recorded conversation, however, stated that the bribed juror had not mentioned the bribe to the other jurors. The trial court determined that no other jurors were affected or tainted. After the court held an evidentiary hearing on the alleged bribery of the juror, it discharged that juror. Additionally, when the court released the jurors from sequestration, it asked the jurors collectively whether they had discussed the case among themselves. They responded negatively.
 
 
 67
 Appellants accuse the court of selective belief, i. e., of believing Fisher's statement that a juror was bribed, but not believing his statement that the bribed juror had discussed the case with the other jurors. They also urge that the court committed reversible error by failing to voir dire the remaining jurors at the time the bribed juror was discharged. Appellants claim that the trial court's conclusion that no other jurors were tainted by the bribed juror is not supported by the record. The Government responds that given the extent to which the bribery plot was infiltrated by government agents it is beyond doubt that the other jurors were unaffected.[25] The Government also notes that the trial court twice asked the jurors whether they had discussed the case among themselves and that they responded negatively.
 
 
 68
 It is well settled in this Circuit that the procedure to be used in investigating incidents of jury tampering and the decisions whether to hold a hearing and whether to grant a mistrial rest in the sound discretion of the trial court. United States v. Buchanan, 633 F.2d 423, 427 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981); United States v. Chiantese, 582 F.2d 974, 978 (5th Cir. 1978), cert. denied, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979); United States v. Khoury, 539 F.2d 441, 443 (5th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); Tillman v. United States, 406 F.2d 930, 937-38 (5th Cir.), vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). The trial court retains such discretion even though this Court has required affirmative proof of the harmlessness of private communications outside the jury room. United States v. Khoury, supra, 539 F.2d at 443.
 
 
 69
 When juror misconduct concerns influences from outside sources, the complete failure of the trial court to hold a hearing constitutes an abuse of discretion and is reversible error because a presumption of prejudice arises when the trial court learns of such influences. United States v. Chiantese, supra, 582 F.2d at 979. Any off-the-record contact with a jury is presumptively prejudicial and the Government bears a heavy burden of proving that such a contact did not affect the jury; if the Government cannot meet this burden, a new trial is required. United States v. Forrest, 620 F.2d 446, 457 (5th Cir. 1980).
 
 
 70
 Significantly, this Court has not adopted a rigid per se rule automatically requiring the reversal of a conviction in cases concerning juror misconduct. See United States v. Betner, 489 F.2d 116, 119 (5th Cir. 1974). We do require that the trial court determine whether the jury misconduct occurred and whether or not it was clearly prejudicial. Id.; United States v. McKinney, 429 F.2d 1019, 1026 (5th Cir. 1970).
 
 
 71
 In United States v. Forrest, supra, 620 F.2d 446, a juror was contacted by a relative who sought to influence the juror in defendants' favor. The juror informed the court that no other jurors were aware of the tampering attempt. However, this Court reasoned that, because that juror would probably claim that she complied with the trial court's instructions to the jurors not to discuss the case among themselves, only the other jurors could be relied upon to state whether any of them had discussed the case with the tainted juror. Id. at 457. The Court was concerned about the serious questions of prejudice raised by the tampering and the possibility that the tainted juror had commented on the merits of the case in the presence of other jurors.[26] Id.
 
 
 72
 Stating that a party claiming that an improperly influenced jury returned a verdict against him must be given an opportunity to prove that claim, citing Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956),[27] the Forrest Court remanded the case for a hearing to determine whether the other jurors knew about the tampering or whether any prejudicial material reached the jury. 620 F.2d at 458. The Court directed that on remand the trial court should question the jurors pursuant to the two-step test adopted in United States v. Herring, supra, 568 F.2d 1099.[28] Id. See United States v. Capo, supra, 595 F.2d 1086. The Court held that it could not conclude that a new trial was warranted, citing United States v. Allison, supra, 481 F.2d 468. A new trial would be required, stated the Court, only if it were determined on remand that the jury was contacted impermissibly and that the Government failed to satisfy its burden of proving the contact was not prejudicial. 620 F.2d at 459. The Forrest Court declined to affirm the convictions because the record was silent about what knowledge the other jurors may have had.
 
 
 73
 We have carefully studied the record and conclude that the district court committed no reversible error in the procedure used in determining that no other jurors were "tainted." After holding a hearing in which it determined that a juror had been tampered with, the court discharged that juror. On that same day the jury began its one-week period of sequestration. Some counsel requested that the court voir dire the other jurors individually to determine the extent of their conversations with the juror who had been removed. However, the court decided to question the jurors collectively or generally because as the court observed it did not want to arouse the suspicions of the jurors about the reason for the removal of the discharged juror. The court stated that it did not want to create the impression that one juror had been removed because someone had contacted her about the case.
 
 
 74
 When the jury was released from sequestration, the court twice asked the jurors collectively whether they had discussed the case among themselves and each time they responded negatively. The court rejected Meinster's counsel's suggestion that the jurors be questioned individually. We conclude that the jurors' collective assurances that they had not discussed the case among themselves were adequate to negate the possibility of prejudice. Because the jurors were questioned by the court concerning their discussions inter se of the case, a remand for the purpose of questioning the jurors, as in United States v. Forrest, supra, is not required.
 
 IV. RECUSAL OF THE TRIAL JUDGE
 
 75
 Appellants allege that the trial judge's participation in ex parte proceedings with government attorneys, in which proceedings or meetings the judge was kept informed about a collateral government investigation into alleged plans of certain defendants to disrupt the trial, coupled with certain comments that he made during a mid-trial bond revocation hearing, demonstrated a bias against the defendants. Appellants urge that the judge should therefore have been disqualified from presiding at trial. They assert that the government engaged in overreaching in its collateral investigations of the alleged plans to disrupt the trial and that it impermissibly contacted the trial judge ex parte. They further complain that the trial judge improperly participated in those collateral investigations.
 
 
 76
 Appellants first complain about two episodes of ex parte contacts that occurred early in the proceedings.[29] In the first, pretrial episode government attorneys unconnected to the prosecutors in this case[30] disclosed to the trial judge that a government informant had learned through conversations with Platshorn and Meinster that they planned to obtain false passports and flee the country at the start of trial. The court was also told that the informant had learned that Platshorn and Meinster had plans to eliminate witnesses. The court revoked the appearance bonds of those two appellants. Government attorneys on a separate occasion contacted the trial judge and disclosed that a second government agent had learned from a conversation with Platshorn and Meinster that they had a plan to intimidate or eliminate witnesses. In response to these revelations the court ordered that electronic security screening devices be placed outside the courtroom.[31]
 
 
 77
 Shortly after the bonds of Platshorn and Meinster were revoked, a full adversarial hearing on the revocation order was held. The court made detailed findings and determined that the bond revocations were justified. Meinster and Platshorn then moved for the judge's recusal on the ground that he had developed a personal bias against them as a result of the ex parte government revelations. The court denied the motion, stating that personal extrajudicial bias could not arise from the proper presentation of evidence in a motion for bond revocation.
 
 
 78
 The third episode of ex parte contacts concerned the alleged conspiracy to obstruct justice.[32] In early November, four weeks before the obstruction indictment was returned, Strike Force attorneys informed the trial judge in his chambers that certain defendants had plotted to disrupt the trial proceedings, intimidate witnesses, and attempt to kill the judge himself.[33] The Strike Force attorneys informed the court about the investigation of the obstruction conspiracy and the court told the attorneys that insofar as it was concerned the government could continue its investigation.[34] After the obstruction of justice indictment was returned on December 6, 1979, the court held a bond revocation hearing and revoked the bonds of Fisher, Grant and Myers, who were still free on bail. Appellants again unsuccessfully filed a motion seeking recusal of the trial judge.
 
 
 79
 Appellants contend that the trial judge allowed his partiality to be seriously questioned by receiving, in ex parte meetings with government attorneys, information concerning the government's collateral investigation of the alleged plots to disrupt the trial and, further, by sanctioning and participating in those investigations. Appellants maintain that, as a result of the trial judge's involvement in the investigation, an involvement which they claim demonstrated the judge's commingling of judicial and prosecutorial roles, the judge should have recused himself.
 
 
 80
 Appellants also charge that recusal of the trial judge was required because several of his comments from the bench demonstrated his bias and prejudice against the defendants. The judge, outside the presence of the jury, made several references to threats against his life and to the thorough security measures that were taken to protect him.
 
 
 81
 Appellants' attempts to obtain recusal of the trial judge were made pursuant to two statutes which govern recusal of federal district judges on the grounds of bias, prejudice, or lack of impartiality. 28 U.S.C.A. §§ 144 and 455.[35] In Davis v. Board of School Comm'rs of Mobile County, 517 F.2d 1044 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), this Court held that the purpose of both disqualification statutes is to guard against personal, extrajudicial bias or the appearance of partiality arising out of such bias.
 
 
 82
 Construing §§ 144 and 455 in pari materia we believe that the test is the same under both. We thus hold that an appellate court, in passing on questions of disqualification of the type here presented, should determine the disqualification on the basis of conduct which shows bias or prejudice or lack of impartiality ... (,) conduct extra-judicial in nature as distinguished from conduct within a judicial context. This means that we give §§ 144 and 455 the same meaning legally for these purposes, whether for purposes of bias and prejudice or when the impartiality of the judge might reasonably be questioned.
 
 
 83
 Id. at 1052, quoted in In re Corrugated Container Antitrust Litigation, 614 F.2d 958, 965 (5th Cir. 1980), cert. denied, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).[36]
 
 
 84
 It is well settled that under either Section 144 or Section 455 an allegation of bias sufficient to require disqualification must demonstrate that the bias is personal as distinguished from judicial in nature.[37] The alleged bias and prejudice, in order to be personal and therefore disqualifying, "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).[38] Thus, a motion for recusal may not ordinarily be predicated upon the judge's rulings in the same or a related case.[39] An exception to the general rule that the disqualifying bias must stem from extrajudicial sources is the situation in which "such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party." Davis v. Board of School Comm'rs, supra, 517 F.2d at 1051.[40]
 
 
 85
 Appellants contend that the trial judge was improperly involved in the collateral investigation of the alleged plans to disrupt the trial. We conclude that the judge did not act improperly. The Strike Force attorneys contacted the trial judge in his capacity as presiding judge in those proceedings and the ex parte revelations made by those attorneys were made for two indisputably proper purposes. First, the information conveyed by the attorneys concerning plans by several defendants to disrupt the proceedings was necessary in order to enable the judge to perform his continuing duty to conduct an orderly trial and to take appropriate measures designed to protect the participants therein. Second, the information concerning the plans of certain defendants to flee from the country was highly relevant to the court's determination on bond revocation. In United States v. Jackson, 430 F.2d 1113 (9th Cir. 1970), the court held that ex parte communication of information concerning threats to witnesses was not a basis for disqualification:
 
 
 86
 The trial judge was informed of the alleged threats to witnesses during his participation in the case because he was presiding over the criminal proceedings lodged against appellants. The fact that the trial judge issued an order revoking appellants' bail bonds is not a disqualifying fact under these circumstances. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Nor is the fact that the trial judge so acted after receiving information from the United States Attorney not made known to appellants in open court.
 
 
 87
 Id. at 1115 (citation and footnote omitted).
 
 
 88
 The trial court in this case was not impermissibly involved in the government's investigation. Although the court was advised that such an investigation was being undertaken, it did not direct the investigation.[41] Government investigations of possible efforts by criminal defendants to disrupt the judicial proceedings are proper. See Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); see also Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966) (judicial approval of use of government informant equipped with concealed recording device to investigate misconduct of defense attorney held constitutional).
 
 
 89
 We turn next to appellants' contention that several comments of the trial judge reflected his personal bias.[42] Meinster stresses that the judge indiscriminately referred to "the defendants" as attempting to disrupt the trial and destroy the integrity of the jury, without distinguishing between the particular charges against particular defendants. However, the record reveals that the trial judge had been informed, from extensive tape recordings and testimony, of numerous statements made by defendants Myers, Grant, Fisher and Platshorn's wife to government informants that they had plans to disrupt the trial.[43]
 
 
 90
 The comments made by the trial judge had a judicial, rather than a personal, origin. In United States v. Archbold-Newball, supra, 554 F.2d at 681-82, this Court held that a trial judge's statement at a bond revocation hearing, based on knowledge acquired in three prior trials, that "these three individuals were members of a conspiracy that I can only describe as a large-scale conspiracy composed of the most vicious individuals that this court has ever seen" was neither personal nor extrajudicial. The comments of the trial judge in the present case were based on information learned in ancillary proceedings which were inseparable from this case, i. e., ex parte meetings in which the judge was warned of threats to disrupt the proceedings and, allegedly, to kill him. The mere fact that some of the remarks made by the judge were not necessary for the resolution of the matter entertained at the hearing at which they were uttered does not convert them into expressions of personal bias.
 
 
 91
 Furthermore, the comments, which were made in a judicial setting and did not stem from an extrajudicial source, do not reflect the "pervasive bias and prejudice" that must be shown in order for a judge to be disqualified for remarks or behavior which takes place in a judicial context. Phillips v. Joint Legislative Comm., supra, 637 F.2d at 1020 n.7; In re Corrugated Container Antitrust Litigation, supra, 614 F.2d at 965; Whitehurst v. Wright, supra, 592 F.2d at 838; Davis v. Board of School Comm'rs, supra, 517 F.2d at 1051.
 
 V. DOUBLE JEOPARDY[44]
 
 92
 This case presents several complicated double jeopardy problems, some of which arose as a result of a prior trial in a North Carolina federal district court.[45] United States v. Meinster, 619 F.2d 1041 (4th Cir. 1980). Meinster, Platshorn and Grant argue that their prosecutions in this trial were barred by their previous convictions in North Carolina. Meinster and Platshorn also argue that their RICO charges in this case were lesser included offenses of the continuing criminal enterprise charge, 21 U.S.C.A. § 848. Because Grant's double jeopardy argument is factually different from that of Meinster and Platshorn, we discuss his contentions separately.
 
 A. Meinster and Platshorn
 
 93
 Meinster and Platshorn were charged with and convicted of three offenses in this case which are relevant to their double jeopardy argument: (1) conspiracy to violate the racketeering statute or RICO, 18 U.S.C.A. § 1962(d); (2) substantive violation of RICO, 18 U.S.C.A. § 1962(c); and (3) violation of the continuing criminal (narcotics) enterprise statute, 21 U.S.C.A. § 848. Meinster and Platshorn were previously convicted in a North Carolina federal district court for aiding and abetting the importation of marijuana, in violation of 21 U.S.C.A. §§ 952(a), 960(a)(1), and 18 U.S.C.A. § 2.[46] The aiding and abetting charge against each arose out of the OSSPREY-DON ELIAS incident. Count 1 of the indictment in the instant case set forth 407 overt acts; among the overt acts was a series of events relating to the OSSPREY incident.
 
 
 94
 Meinster[47] advances what is essentially a two-pronged double jeopardy argument. He maintains first that the aiding and abetting offense was a transaction within a larger, unified conspiracy-the continuing criminal enterprise-and that the government may not proceed with multiple prosecutions, either for conspiracy or for substantive offenses, if there is a unified conspiracy. Second, he argues that in narcotics conspiracy cases a RICO charge is a lesser included offense of a § 848 continuing criminal enterprise offense.
 
 
 95
 Before addressing Meinster's contentions, we review the double jeopardy law that is relevant to issues raised by both Meinster and Grant. Both rely in large part on Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); United States v. Ruigomez, 576 F.2d 1149 (5th Cir. 1978); and United States v. Smith, 574 F.2d 308 (5th Cir.), cert. denied, 439 U.S. 931, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978), subsequent appeal sub nom. United States v. Stratton, 649 F.2d 1066 (5th Cir. 1981).
 
 
 96
 The double jeopardy clause protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense. Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981); United States v. Wilson, 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975); North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The test for determining whether two offenses are the same for purposes of double jeopardy is "whether each provision requires proof of an additional fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); see Albernaz v. United States, supra, 101 S.Ct. at 1141; Whalen v. United States, 445 U.S. 684, 692, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980); Jeffers v. United States, supra, 432 U.S. at 151, 97 S.Ct. at 2216; Brown v. Ohio, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). The Blockburger test is the test for determining whether two offenses are the same for the purposes of barring successive prosecutions as well as simultaneous prosecutions. Illinois v. Vitale, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980); Brown v. Ohio, supra, 432 U.S. at 166, 97 S.Ct. at 2225.[48]
 
 
 97
 Although the Blockburger test has been referred to as the "same evidence" test, that standard focuses not on the evidence adduced at trial but rather on the elements of the offense charged. Brown v. Ohio, supra, 432 U.S. at 166, 97 S.Ct. at 2225; United States v. Cowart, 595 F.2d 1023, 1029 (5th Cir. 1979). "If each (offense) requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." Ianelli v. United States, 420 U.S. 770, 785 n.17, 95 S.Ct. 1284, 1293 n.17, 43 L.Ed.2d 616 (1975).
 
 
 98
 Under the Blockburger test it is possible for a single act or transaction to give rise to separate and distinct offenses under separate statutes. Albernaz v. United States, supra, 101 S.Ct. at 1142, 1145 n.3; Harris v. United States, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597 (1959); Gore v. United States, 357 U.S. 386, 389, 78 S.Ct. 1280, 1282, 2 L.Ed.2d 1405 (1958); United States v. Davis, 656 F.2d 153, 156 (5th Cir. 1981); United States v. Dunbar, 591 F.2d 1190, 1192 (5th Cir. 1979), panel opinion adopted in relevant part and remanded, 611 F.2d 985 (5th Cir.) (en banc), cert. denied, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980); United States v. Smith, supra, 574 F.2d at 310.
 
 
 99
 As one court has noted, the Blockburger test "is not easily applied to complex conspiracy prosecutions." United States v. Solano, 605 F.2d 1141, 1144 (9th Cir. 1979), cert. denied, 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980). This Court stated in United States v. Marable, 578 F.2d 151, 153 (5th Cir. 1978), that determining whether two conspiracies are in fact the same requires a more detailed inquiry than that required with respect to other offenses under the Blockburger test because the precise bounds of a single conspiracy are more difficult to determine.[49] The characteristic which defines the scope of a conspiracy is the unlawful agreement, and in order to determine whether the government can prosecute a defendant for more than one conspiracy a court must ordinarily determine whether there was more than one agreement. Id.[50]
 
 
 100
 This Court has on several occasions confronted the problem of double jeopardy in the context of a narcotics conspiracy case. In United States v. Ruigomez, 576 F.2d 1149 (5th Cir. 1978), the defendant was first acquitted on a charge of conspiracy to possess marijuana with intent to distribute. A second indictment, which charged an identical conspiracy count and an additional count of conspiring to distribute marijuana, was dismissed on double jeopardy grounds because the government split a unitary narcotics conspiracy into multiple prosecutions. The Court stated that, rather than apply the "same offense" test which focuses on the similarity vel non of the evidence adduced, it would apply the following test: "whether the particular transactions alleged in the indictments were within a larger, unified conspiracy." Id. at 1151. The Court found that there was but a single, continuing conspiracy. The Court applied
 
 
 101
 the usual tests for determining the existence of a unified conspiracy-the participants shared a continuing, common goal of buying and selling (or importing) marijuana for profit; the operations of the conspiracy followed an unbroken and repetitive pattern; and the cast of conspirators remained much the same.
 
 
 102
 Id.; see United States v. Futch, supra, 637 F.2d at 389; United States v. Stricklin, supra, 591 F.2d at 1122.
 
 
 103
 It is also settled in this Circuit that the government may not split a single narcotics conspiracy to distribute different drugs for purposes of a separate conspiracy prosecution for each drug. United States v. Marable, supra, 578 F.2d 151 (heroin and cocaine).
 
 
 104
 Although the government may not ordinarily separately prosecute a defendant for two conspiracies that are in reality the same conspiracy, or prosecute a defendant for a conspiracy or "transaction" that is part of a larger conspiracy, under the Blockburger test it is possible for a single criminal agreement or conspiracy to give rise to distinct offenses under specific, separate conspiracy statutes. See Albernaz v. United States, supra, 101 S.Ct. at 1142, 1145 n.3; American Tobacco Co. v. United States, 328 U.S. 781, 788, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575 (1946); United States v. Dunbar, supra, 591 F.2d at 1192-93; United States v. Smith, supra, 574 F.2d at 311.[51] While courts have restricted the prosecutor's power to interpret statutes so as to permit multiple punishments, they have not generally restricted the legislature's power to enact such statutes. Albernaz v. United States, supra, 101 S.Ct. at 1145; Ianelli v. United States, supra, 420 U.S. at 791, 95 S.Ct. at 1296; United States v. Davis, supra, 656 F.2d at 156; United States v. Chagra, 653 F.2d 26, 31 (1st Cir. 1981).
 
 
 105
 In Albernaz v. United States, supra, 101 S.Ct. 1137, the Supreme Court held that a single narcotics conspiracy or agreement may constitute the separate offenses of conspiracy to import marijuana, 21 U.S.C.A. § 963, and conspiracy to distribute marijuana, 21 U.S.C.A. § 846. The Court held that Congress intended that consecutive sentences could be imposed for violations of Sections 846 and 963 in a case[52] involving only a single agreement or conspiracy. The Court focused on the distinct elements of each section, noting that each provision requires proof of a fact that the other does not and that each requires proof of a different objective of the agreement, and held that the Blockburger test was satisfied.
 
 
 106
 In United States v. Smith, supra, 574 F.2d 308, the defendant had been convicted in an earlier trial for conspiracy to distribute marijuana in violation of 21 U.S.C.A. § 846 and possession of marijuana with intent to distribute it, in violation of 21 U.S.C.A. § 841(a)(1). He was subsequently indicted for a substantive RICO violation and for conspiracy to violate RICO. Seventy-two overt acts were alleged in the RICO indictment; five of those acts-relating to attempts to bribe public officials-had also been alleged to support the earlier marijuana conspiracy conviction. However, the RICO indictment did not allege any drug offenses as "racketeering activity" as it could have under 18 U.S.C.A. § 1961(1)(D). Rather, the predicate acts included bribery, obstruction of justice, and obstruction of a criminal investigation. This Court held that the previous conspiracy to distribute conviction did not bar the RICO conspiracy because "the marijuana conspiracy and the RICO conspiracy, even if parts of a single larger conspiracy, are separate offenses ...." Id. at 311. The Court noted that although the two conspiracies shared one common element-an agreement must be shown under each statute-the offenses required proof of different essential facts and elements.[53]
 
 
 107
 Appellants rely heavily on Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). This Court in United States v. Stricklin, supra, 591 F.2d at 1123, discussed Jeffers in some depth:
 
 
 108
 (T)he two offenses involved (in Jeffers) were a conspiracy to distribute heroin and cocaine in violation of 21 U.S.C. § 846 and a continuing criminal enterprise to violate the drug laws in violation of 21 U.S.C. § 848. Although the facts in Jeffers made it unnecessary to settle definitively the issue of whether § 846 is a lesser included offense of § 848, 432 U.S. at 152-53 n.20, 97 S.Ct. 2207, (at 2217 n.20) the Court's discussion of the issue indicates that the question would be answered affirmatively because § 848 requires proof of an agreement among the persons involved in the continuing criminal enterprise and thus requires proof of every fact necessary to show a violation under (§ 846) as well as proof of several additional elements. Id. at 147-54, 97 S.Ct. 2207 (at 2214-2218). See also Id. at 160 n.7, 97 S.Ct. 2207 (at 2221 n.7) (Stevens, J., concurring in part). Furthermore, it is our conclusion that § 846 is a lesser included offense of § 848 where the agreement and transactions involved in the two cases are the same. A double jeopardy defense will lie where the government has previously prosecuted a defendant under either § 846 or § 848 and then seeks to prosecute him again on the basis of the same criminal agreement under the other statute.
 
 
 109
 The Stricklin Court held that a prior conspiracy prosecution under § 846 does not bar a later prosecution under § 848 if the government has evidence of a separate conspiracy with which to satisfy the "in concert" element of § 848. 591 F.2d at 1124.
 
 
 110
 The First Circuit recently considered the issue whether a conviction on a § 848 charge encompasses for double jeopardy purposes all narcotics offenses that might have been, but were not, used to prove a § 848 charge, and thus bars a subsequent prosecution for all the narcotics offenses that occurred during the period covered by the § 848 charge and that might have been, but were not, used to prove the § 848 charge. United States v. Chagra, 653 F.2d 26, 27 (1st Cir. 1981). The court "reject(ed) the defendant's claim that double jeopardy automatically attaches to underlying offenses that might have been used to help prove a § 848 violation-when those violations were not in fact so used." Id. at 33-34.[54] The court reasoned that to adopt the defendant's position would be in effect to hold that, if the government brings a § 848 charge and loses, all underlying offenses in addition to all offenses that occurred during the period covered by the § 848 charge would thereby be immunized from prosecution. Id. at 32.
 
 
 111
 We turn now to Meinster's specific contentions. He argues that the aiding and abetting offense was a transaction within a larger unified conspiracy, the continuing criminal enterprise, and that the government is barred from proceeding with multiple prosecutions, even for substantive offenses, if there is a unified conspiracy. This contention is without foundation.
 
 
 112
 Meinster's assertion that the aiding and abetting offense is a transaction within a larger unified conspiracy is based primarily upon United States v. Ruigomez, supra, 576 F.2d 1149. Meinster focuses on the word "transaction" in the Ruigomez test: whether the particular transactions were within a larger unified conspiracy. 576 F.2d at 1151. Meinster would have us read Ruigomez as precluding multiple trials for all transactions-all offenses, substantive or conspiracy-within a larger unified conspiracy. Such a reading is an unwarranted extension of Ruigomez. We read Ruigomez as prohibiting the government from carving up a single conspiracy into multiple conspiracy prosecutions. Were we to read Ruigomez as broadly as Meinster would have us read it, prior prosecutions of substantive predicate offenses or narcotics violations would preclude later conspiracy prosecutions under RICO and § 848. That result is inconsistent with the very nature of those two statutes, which is that they require proof of predicate offenses or violations.[55]
 
 
 113
 Meinster asserts that in the situation in which a defendant is charged under § 848, the perpetration of constituent substantive offenses is "part and parcel" of the large conspiracy-type offense. Indeed, this is true; underlying violations are the very matters that trigger the applicability of § 848. Jeffers v. United States, supra, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168, does not support Meinster's claim that a prior substantive narcotics charge which is committed in the operation of a continuing criminal enterprise precludes a later § 848 prosecution. Jeffers indicates that a prosecution for conspiracy to distribute narcotics in violation of 21 U.S.C.A. § 846 is a lesser included offense of § 848 because § 848 requires proof of an agreement among the persons participating in the continuing criminal enterprise and thus requires proof of every fact necessary to show a violation under § 846 as well as proof of several additional elements. Jeffers does not stand for the proposition that a prior prosecution for a substantive offense bars a later continuing criminal enterprise prosecution under § 848.
 
 
 114
 Meinster also complains that the government listed as overt acts in the instant indictment several incidents which gave rise to the North Carolina prosecution. He contends that the government is barred from using the facts underlying the aiding and abetting conviction as overt acts in this conspiracy prosecution. However, the allegation of an independent crime as an overt act of a conspiracy does not immunize a defendant from an indictment on that separate offense. United States v. Brunk, 615 F.2d 210, 211 (5th Cir. 1980); see also United States v. Smith, supra, 574 F.2d 308 (no double jeopardy violation where same overt acts alleged in prior prosecution for conspiracy to distribute marijuana, 21 U.S.C.A. § 846, also alleged in later RICO (substantive and conspiracy) prosecution).[56]
 
 
 115
 Meinster seems to recognize that his suggested reading of Ruigomez and Jeffers as prohibiting prosecution of a larger conspiracy after one or more prosecutions of substantive offenses may be an overly expansive reading because he also claims that the aiding and abetting prosecution is "in effect a detailed conspiracy case." This claim ignores the substantive nature of an aiding and abetting offense.[57]
 
 
 116
 The essence of a conspiracy offense is proof of knowledge of and voluntary participation in an agreement to violate the law, whereas aiding and abetting requires that there be a "community of unlawful intent" between the aider and abettor and the principal. United States v. Bright, 630 F.2d 804, 813 (5th Cir. 1980). That community of intent is not the same as a conspiratorial agreement, id., and proof of aiding and abetting does not require proof of an agreement. Ianelli v. United States, supra, 420 U.S. at 777 & n.10, 95 S.Ct. at 1289 n.10; Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954). An aiding and abetting offense occurs when a defendant "willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wished to bring about." United States v. Indelicato, 611 F.2d 376, 385 (1st Cir. 1979); see United States v. Cowart, supra, 595 F.2d at 1035; United States v. Longoria, 569 F.2d 422, 425 (5th Cir. 1978); United States v. Martinez, 555 F.2d 1269, 1271-72 (5th Cir. 1977). In order to prove association there must be evidence that the defendant shared the criminal intent of the principal, while in order to prove participation there must be evidence that the defendant committed some overt act designed to aid in the success of the criminal venture. United States v. Cowart, supra, 595 F.2d at 1035; United States v. Longoria, supra, 569 F.2d at 425; United States v. Martinez, supra, 555 F.2d at 1272. Aiding and abetting has two components: " '(a)n act on the part of a defendant which contributes to the execution of a crime and the intent to aid in its commission.' " United States v. Smith, 546 F.2d 1275, 1284 (5th Cir. 1976), quoting United States v. Greer, 467 F.2d 1064, 1069 (7th Cir. 1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).
 
 
 117
 The second prong of Meinster's double jeopardy argument is his claim that the RICO charges in this narcotics conspiracy case are lesser included offenses of the § 848 continuing criminal enterprise count.[58] Before addressing this contention we must discuss the charges against Meinster and the elements of both RICO and § 848.
 
 
 118
 Count 1 of the superseding indictment charged Meinster and all other appellants except Grant with conspiring to violate RICO, 18 U.S.C.A. § 1962(d). Count 1 incorporated numerous other counts of the indictment as the predicate acts of racketeering activity, including charges of violations of 18 U.S.C.A. §§ 1201(a)(3) and (c), 1503, and 1952, and 21 U.S.C.A. §§ 841(a)(1), 843(b), 952, and 963. Count 2 charged a substantive violation of RICO, 18 U.S.C.A. §§ 1961, 1962(c), and 1963. Count 2 listed many of the same predicate acts included in Count 1. Most of the predicate acts included in Counts 1 and 2 referred to counts brought under Title 21, United States Code. With respect to Meinster, all of the predicate acts listed in Counts 1 and 2 were alleged violations of Title 21. With respect to Platshorn, the predicate acts listed in the first two counts included, in addition to the numerous Title 21 narcotics charges, two counts charging violation of Title 18: 18 U.S.C.A. §§ 1952 and 1201(a)(3) and (c).
 
 
 119
 Count 34 of the superseding indictment charged Platshorn and Meinster with engaging in a continuing criminal enterprise. The violations listed as part of the continuing series of narcotics violations were violations of 21 U.S.C.A. §§ 841(a)(1), 843(b), 952, and 963. However, Count 34 did not allege that the underlying violations were limited to other incidents charged in the indictment.
 
 
 120
 In order to prove a substantive RICO violation, 18 U.S.C.A. § 1962(c),[59] the Government must prove the following elements: (1) the existence of an enterprise which affects interstate or foreign commerce; (2) that the defendant "associated with" the enterprise; (3) that the defendant participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity, i. e., by committing at least two acts of racketeering activity designated in 18 U.S.C.A. § 1961(1). United States v. Bright, supra, 630 F.2d at 829; United States v. Elliott, 571 F.2d 880, 897-99 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). RICO does not criminalize engaging in a pattern of racketeering activity standing alone; the gravamen of a RICO offense is the conduct of an enterprise through a pattern of racketeering activity. United States v. Elliott, supra, 571 F.2d at 899 n.23. The two predicate crimes need not be related to each other but must be related to the affairs of the enterprise. Id. It does not matter that each defendant participated in the affairs of the enterprise through different or unrelated crimes, so long as an inference may be drawn that each crime was intended to further the enterprise's affairs. Id. at 902-03.
 
 
 121
 In United States v. Turkette, --- U.S. ----, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court held that the term "enterprise" encompasses both legitimate and illegitimate enterprises.[60] In that decision the Court discussed the elements of RICO:
 
 
 122
 In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.
 
 
 123
 101 S.Ct. at 2528 (footnote omitted).
 
 
 124
 Proof of a RICO conspiracy charge requires that the Government prove the additional element of agreement. The defendant must have "objectively manifested an agreement to participate directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." United States v. Elliott, supra, 571 F.2d at 903 (emphasis omitted); see United States v. Stratton, 649 F.2d 1066, 1074 (5th Cir. 1981). Such agreement is the gravamen of a RICO conspiracy charge. The Elliott Court stated:
 
 
 125
 (T)he object of a RICO conspiracy is to violate a substantive RICO provision-here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity-and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity.
 
 
 126
 571 F.2d at 902.
 
 
 127
 In order to prove a continuing criminal enterprise, in violation of 21 U.S.C.A. § 848,[61] the Government must prove that the defendant engaged in a continuing series of narcotics violations. "(A) which are undertaken by such persons in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (B) from which such person obtains substantial income or resources." United States v. Michel, 588 F.2d 986, 1000 (5th Cir. 1979).
 
 
 128
 The Government need only prove, under § 848, that the defendant organized, supervised, or managed at least five other persons; the section is disjunctive in that respect. United States v. Mannino, 635 F.2d 110, 116 (2d Cir. 1980). Such relationships need not have existed at the same moment in time; it is sufficient if there exist separate, individual relations of control with at least five persons. Id. at 116-17. Furthermore, the requisite five persons need not act in concert at the same time. United States v. Michel, supra, 588 F.2d at 1000 n.14; United States v. Bolts, 558 F.2d 316, 320-21 (5th Cir. 1977), cert. denied, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1978). Additionally, the same type of superior-subordinate relationship need not exist between the supervisor and each of the five other persons involved. United States v. Mannino, supra, 635 F.2d at 117. The series element is established by proof of three or more related violations. United States v. Johnson, 575 F.2d 1347, 1357 (5th Cir. 1978); United States v. Fry, 413 F.Supp. 1269, 1272 (E.D.Mich.1976), aff'd, 559 F.2d 1221 (6th Cir. 1977); United States v. Bergdoll, 412 F.Supp. 1308, 1317 (D.Del.1976).
 
 
 129
 Section 848 is a conspiracy-type statute. The Supreme Court stated in Jeffers v. United States, supra, 432 U.S. at 149-50, 97 S.Ct. at 2215, that it "assume(d), arguendo, that § 848 does require proof of an agreement among the persons involved in the continuing criminal enterprise." However, § 848 is an unusual conspiracy statute. Unlike a typical conspiracy statute, which proscribes "an inchoate offense, the essence of which is an agreement to commit an unlawful act," Ianelli v. United States, supra, 420 U.S. at 777, 95 S.Ct. at 1289, § 848 requires that the defendant commit a federal narcotics violation which is part of a continuing series of such violations committed by the defendant in concert with, i. e., in conspiracy with, five or more persons with respect to whom the defendant acts as an organizer, supervisor or manager.[62]
 
 
 130
 We conclude that the RICO counts are not lesser included offenses of the § 848 count. Both the substantive RICO and RICO conspiracy counts require proof of facts and elements not required to be proved under § 848, even though there is a substantial overlap in the proof offered to establish the crimes. In a substantive or conspiracy RICO prosecution the Government must prove the existence of an enterprise that affects interstate commerce. The existence of an enterprise is an element that is separate from the element of the pattern of racketeering activity in which the enterprise engages; the enterprise is proved by evidence of a continuing organization and by evidence that the members function as a continuing unit. United States v. Turkette, supra, 101 S.Ct. at 2528. Mere proof of a pattern of racketeering activity, i. e., commission of at least two acts of racketeering activity, is not sufficient to establish a RICO violation; there must also be proof of the existence of the enterprise itself. Section 848, by contrast, does not require proof of a RICO type enterprise. Rather § 848 merely requires proof that the defendant undertook a continuing series of violations in concert or in conspiracy with five or more persons.
 
 
 131
 Proof of a § 848 conspiracy does not establish proof of every fact and element necessary to show a RICO conspiracy violation. The object of a RICO conspiracy, as this Court stated in United States v. Elliott, supra, 571 F.2d at 902, is to violate a substantive RICO provision, not merely to commit each of the predicate crimes constituting a pattern of racketeering activity. The gist of a RICO offense is that the defendant furthered a racketeering enterprise through a pattern of racketeering activity; a RICO count charges not the commission of the predicate crimes but rather the furthering of the enterprise. United States v. Bright, supra, 630 F.2d at 813. The object of a § 848 conspiracy could be merely to commit the particular narcotics violations which taken cumulatively constitute a continuing series of violations.
 
 
 132
 We cannot agree with Meinster that in this case the RICO charges are lesser included offenses of the § 848 count for another reason. A RICO substantive charge is not a conspiracy charge and it is axiomatic that a substantive offense is distinct from a conspiracy to commit that or another substantive offense. We hold that a RICO conspiracy count is not the same offense, for double jeopardy purposes, as a RICO substantive count. We find no principled basis for holding that a RICO substantive charge is a lesser included offense of a § 848 conspiracy-type charge.
 
 
 133
 Finally, we decline to hold that the RICO counts are lesser included offenses of the § 848 count because although in one sense the former counts are narrower than the latter, in another crucial sense the former counts are broader. Meinster asserts that in a case concerning a unitary narcotics conspiracy the only time a RICO count would not constitute a lesser included offense of § 848 is when the defendant was not a manager, supervisor or organizer. He further maintains that the conspiracy in this case was exclusively a narcotics conspiracy. However, the RICO counts charged numerous predicate acts which could not have been and were not charged in the § 848 count, including: conspiracy to commit kidnapping within the special aircraft jurisdiction of the United States (air piracy), 18 U.S.C.A. § 1201(a)(3) and (c); obstruction of justice, 18 U.S.C.A. § 1503; and interstate or foreign travel in aid of racketeering, 18 U.S.C.A. § 1952. Although those Title 18 offenses were integrally related to the narcotics enterprise, nevertheless they were offenses that could not have been charged against the defendants as underlying violations under § 848. The scope of RICO is broader than the scope of § 848; the very purpose of RICO is to enable the government to reach criminal enterprises such as the Black Tuna group which commit diverse crimes in furtherance of their organized criminal efforts. As we noted earlier, one court has stated that "racketeering activity in the abstract does not necessarily involve drug related activity." United States v. Solano, supra, 605 F.2d at 1145, citing United States v. Smith, supra, 574 F.2d at 310-11.[63]
 
 
 134
 We do not agree with Meinster that the RICO conspiracy and the § 848 conspiracy constitute a unitary conspiracy. The RICO conspiracy included numerous acts not chargeable under § 848, including air piracy, interstate and foreign travel in aid of racketeering and obstruction of justice. Meinster's reliance upon United States v. Ruigomez, supra, 576 F.2d 1149, is misplaced.
 
 B. Grant
 
 135
 Grant was previously convicted in a North Carolina federal district court on two charges arising out of the OSSPREY-DON ELIAS incident: (1) aiding and abetting the importation of marijuana, in violation of 21 U.S.C.A. § 952(a), 960(a)(1), and 18 U.S.C.A. § 2; and (2) conspiracy to import marijuana and to possess marijuana with the intent to distribute it, in violation of 21 U.S.C.A. §§ 841(a)(1), 952, and 963. In the present case Grant was convicted on a substantive racketeering or RICO charge, 18 U.S.C.A. § 1962(c); however, he was not charged in this case with conspiring to violate RICO, 18 U.S.C.A. § 1962(d). The North Carolina convictions are not alleged in the indictment in the present case as predicate acts of racketeering activity.
 
 
 136
 Grant contends that his prior North Carolina convictions are lesser included offenses of his substantive RICO charge. He characterizes the issue as "whether a prior trial for an act of racketeering precludes a subsequent RICO trial." The resolution of that issue is well settled. As mentioned previously in response to a similar contention by Meinster, a defendant may be convicted for the predicate acts which form the basis of a RICO charge and subsequently charged under RICO. E. g., United States v. Anderson, supra, 626 F.2d at 1367; see cases cited at note 56, supra.
 
 
 137
 Grant also argues that, even though the North Carolina convictions were not named as predicate acts of racketeering, those convictions were within the "pattern of racketeering activity" described in the present indictment. This argument is without merit insofar as it suggests that the government cannot use the facts underlying the North Carolina convictions as overt acts in the RICO count. As stated earlier in answer to a similar contention by Meinster, the allegation of an independent crime as an overt act of a conspiracy does not prevent prosecution of the defendant on that separate offense. United States v. Brunk, supra, 615 F.2d at 211.
 
 
 138
 That contention is also without merit insofar as it is in essence a claim that the prior conspiracy prosecution bars the later substantive RICO prosecution. Conspiracy may properly be alleged as a predicate act of racketeering under RICO when it involves any of the substantive offenses listed in 18 U.S.C.A. § 1961(1)(D) (defining "racketeering activity"). United States v. Weisman, 624 F.2d 1118, 1123-24 (2d Cir.), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).
 
 
 139
 Grant's reliance upon Jeffers v. United States, supra, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168, United States v. Ruigomez, supra, 576 F.2d 1149, and United States v. Smith, supra, 574 F.2d 308, is misplaced because in the present case it is not alleged that he participated in a larger RICO conspiracy. Rather, he was charged only with a substantive RICO violation.[64] As discussed previously, those three cases each concerned the problem of multiple conspiracy prosecutions.
 
 VI. MOTIONS FOR SEVERANCE
 
 140
 Appellants Myers, Fisher and Echezarreta allege that the trial court abused its discretion in denying their separate motions for severance. Echezarreta claims that he was misjoined under Fed.R.Crim.P. 8(b)[65] because the RICO conspiracy count charged several separate conspiracies rather than a single overall conspiracy. Each of these appellants claims that he was prejudicially joined under Fed.R.Crim.P. 14.[66]
 
 A. Rule 8(b)
 
 141
 Echezarreta contends that the face of the RICO conspiracy count reveals multiple separate conspiracies, not a unified conspiracy.[67] He maintains that a substantial identity of facts and parties does not exist, and characterizes the predicate crimes and the 407 overt acts listed in Count 1 as "totally unconnected transactions" and as "diverse events." Echezarreta's contention is meritless. The RICO conspiracy count charged a unified conspiracy; the defendants were alleged to have agreed to participate directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity.
 
 
 142
 It is well settled that joinder under Rule 8(b) is proper where an indictment charges multiple defendants with participation in a single conspiracy and also charges some but not all of the defendants with substantive counts arising out of the conspiracy. United States v. Weinrich, 586 F.2d 481, 495 (5th Cir. 1978), cert. denied, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979).
 
 
 143
 The RICO conspiracy count was the common thread or link of the joinder of parties and counts in the single indictment. The allegation in the RICO conspiracy count was that the defendant agreed to further a racketeering enterprise through a pattern of racketeering activity. The diverse parties were tied together through the overall scheme and the concept of the illegal enterprise. The overt acts and substantive predicate crimes that were alleged in the indictment to have furthered the pattern of racketeering were sufficiently connected that their interrelationship constituted an offense consisting of a series of acts or transactions. United States v. Stratton, supra, 649 F.2d at 1073-74 & n.8; United States v. Bright, supra, 630 F.2d at 812-13; United States v. Campanale, 518 F.2d 352, 359 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).
 
 
 144
 Because the allegations of the RICO count of the indictment, taken as true, establish a single conspiracy there is no inherent prejudice to the defendants and joinder was proper under Rule 8(b); severance is then a matter of trial court discretion under Rule 14. United States v. Grassi, 616 F.2d 1295, 1302 (5th Cir.) cert. denied, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). There was no abuse of that discretion in this instance.
 
 B. Rule 14
 
 145
 In ruling on a Rule 14 motion for severance the trial court must balance the right of the defendant to a fair trial, keeping in mind the possibility of prejudice in a joint trial, against the public's interest in efficient and economic administration of justice, and sever defendants as the needs of justice dictate. United States v. Morrow, 537 F.2d 120, 136 (5th Cir. 1976), cert. denied, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). Denial of a motion for severance is reversible only for an abuse of discretion and a showing of compelling prejudice must be made before a trial court's ruling will constitute an abuse of discretion. United States v. Bright, supra, 630 F.2d at 813. Appellate courts are reluctant to second guess a trial court's refusal to grant a severance. United States v. Horton, 646 F.2d 181, 186 (5th Cir. 1981); United States v. Marino, 617 F.2d 76, 83 (5th Cir. 1980).
 
 
 146
 In reviewing the trial court's ruling for abuse of discretion we consider whether the jury could "individualize each defendant in his relation to the mass," Kotteakos v. United States, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946), i.e., whether the jury could avoid cumulating the evidence against all the defendants and make individualized guilt determinations. United States v. Bright, supra, 630 F.2d at 813. We must determine whether the jury could follow the court's cautionary and admonitory instructions and accordingly "collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct." Peterson v. United States, 344 F.2d 419, 422 (5th Cir. 1965) (quoting United States v. Kahaner, 203 F.Supp. 78, 81 (S.D.N.Y.1962)). This Court has stated that "(t)he remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction." United States v. Morrow, 537 F.2d 120, 136 (5th Cir. 1976), cert. denied, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). See United States v. Horton, supra, 646 F.2d at 186.
 
 
 147
 Our review ultimately focuses on the verdict. "Convictions will invariably be sustained if it may be inferred from the verdict that the jury 'meticulously sifted the evidence.' " Tillman v. United States, 406 F.2d 930, 936 (5th Cir.) (quoting 8 J. Moore, Moore's Federal Practice P 14.04(1), at 14-15 (2d ed. 1968), vacated in part on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).
 
 
 148
 Echezarreta and Fisher emphasize the disparity in the quantum of evidence against them as contrasted with that offered against other appellants such as Meinster and Platshorn.[68] Echezarreta also cites the publicity caused by the alleged obstruction efforts by other defendants which allegedly prejudiced him.
 
 
 149
 The trial court adequately prevented the likelihood of any spillover effect by specifically instructing the jury to consider each offense separately and each defendant individually. Furthermore, the jury's verdict reflects that it carefully considered the evidence supporting each charge against each defendant. Echezarreta was convicted on four counts but acquitted on two, while several other defendants were acquitted on some of the counts against them. With respect to Echezarreta's claim that he was prejudiced by mid-trial publicity, we concluded earlier in this opinion that the trial court adequately protected the jury from exposure to adverse publicity by temporary sequestration, by constant admonitions to the jury to avoid exposure to news media reports, and by repeated inquiries to determine whether any jurors had received extrinsic information about the trial.
 
 
 150
 Myers argues that he was prejudicially joined because he successfully withdrew from the conspiracy well before the commission of most of the substantive offenses and overt acts charged in the indictment. He maintains that he suffered compelling prejudice from the introduction of evidence concerning offenses and overt acts which occurred after he withdrew. Myers claims that he withdrew from the enterprise and from the RICO conspiracy in September 1977 after the PRESIDENTIAL incident. He cites testimony elicited from government witness Jiminez on cross-examination that as a result of the PRESIDENTIAL fiasco, Myers broke off relations with Meinster and Platshorn in September 1977.
 
 
 151
 However, the relations between Myers and Meinster and Platshorn soon resumed. In December 1977 Myers contacted Meinster and Platshorn by phone and mediated a financial dispute between them and Echezarreta. Furthermore, Myers ignores the testimony given earlier by Jiminez on direct examination that in December 1977, Myers asked him (Jiminez) if he could produce a bogus mortgage for property owned by the Green Turtle Construction Company. Jiminez testified that that property had been purchased by Meinster, Platshorn and Myers.
 
 
 152
 This Court recently addressed a defendant's claim of withdrawal from a conspiracy:
 
 
 153
 In order to withdraw, a conspirator must show that he acted affirmatively to defeat or disavow the purpose of the conspiracy. United States v. Wentland, 582 F.2d 1022, 1025-26 (5th Cir. 1978), cert. denied, 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979). See also United States v. Jimenez, 622 F.2d 753, 755 (5th Cir. 1980) (to show withdrawal, defendant must demonstrate that he took affirmative acts inconsistent with the object of the conspiracy and communicated this in a manner reasonably calculated to reach his or her coconspirators). The burden of proving withdrawal from a conspiracy rests upon the defendant. United States v. Bradsby, (628 F.2d 901, 905 (5th Cir. 1980)).
 
 
 154
 United States v. Killian, 639 F.2d 206, 209 (5th Cir. 1981); see Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); United States v. Pearson, 508 F.2d 595, 597 (5th Cir.), cert. denied, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975); United States v. James, 609 F.2d 36, 41-42 (2d Cir. 1979), cert. denied, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); United States v. Dorn, 561 F.2d 1252, 1256 (7th Cir. 1977). Mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal. See Hyde v. United States, supra, 225 U.S. at 369, 32 S.Ct. at 803; United States v. Continental Group, Inc., 603 F.2d 444, 467 (3d Cir. 1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).
 
 
 155
 The statement by Jiminez on cross-examination that in September 1977 Myers broke off relations completely with Platshorn and Meinster does not establish as a matter of law that Myers withdrew. The evidence as a whole demonstrates that Myers did not cease his enterprise activities in totality in September 1977.
 
 
 156
 Myers' claim that a new and separate conspiracy was formed after his withdrawal is not supported by the record. The record reflects that a single Black Tuna enterprise conspiracy spanned the entire period covered by the indictment.
 
 
 157
 Even if we agreed that Myers withdrew from the conspiracy in September 1977, we discern no compelling prejudice suffered by Myers as a result of his joinder. The abundant evidence of events occurring before September 1977 and before the PRESIDENTIAL incident clearly implicated Myers in the Black Tuna conspiracy. Myers' contention that he was prejudiced by the disparity in the quantity of evidence against him as contrasted with that offered against other defendants is based upon the fact that he was named in only 10 of 407 overt acts listed in the indictment. However, Myers was named in 8 of the 36 counts, including the two RICO counts and a § 848 continuing criminal enterprise count. Joinder of Myers under these circumstances demonstrates no prejudice to him.
 
 VII. ALLEGED VINDICTIVE PROSECUTION
 
 158
 Appellant Myers claims that the government's decision to charge him in the superseding indictment with two counts not contained in the original indictment was an act of vindictive prosecution in retaliation for his vigorous assertion of his constitutional and procedural rights. Myers urges that the district court erred by failing to dismiss all the counts in the superseding indictment pertaining to him or at least to dismiss those two counts added in the superseding indictment.
 
 
 159
 The first indictment named Dr. Morris Keller as a defendant. After Keller pled guilty and cooperated with the government, the superseding indictment was obtained. The superseding indictment added two charges against Myers: a substantive count (an importation charge arising from the "Punta Gorda" incident), and a continuing criminal enterprise count, 21 U.S.C.A. § 848.
 
 
 160
 Myers' claim that the additional counts were a result of prosecutorial vindictiveness rests on an alleged statement made by a government attorney to one of Myers' attorneys to the effect that Keller was not the source for the newly available evidence that brought about the § 848 count. Counsel for Myers filed an affidavit with the district court stating that such statements had been made to her by the prosecutor; the prosecutor responded in his own affidavit by asserting that he told Myers' counsel that Keller was not the entire source for the new count. The prosecutor stated in his affidavit that new evidence had been discovered since the time of the filing of the original indictment and that, inter alia, that new information more clearly outlined Myers' supervisory role in the Black Tuna organization.[69] The prosecutor further stated in his affidavit that the § 848 count was never used to threaten Myers or his counsel for any purpose including obtaining a plea to any of the counts in the original indictment, and that there had been very little plea discussion with Myers.
 
 
 161
 After an in camera examination of the testimony that was presented to the second grand jury and the attorneys' affidavits, the district court denied the vindictiveness claim.
 
 
 162
 Myers argues on appeal that the new charges were based solely on evidence that had been previously presented to the same grand jury that returned the original indictment and that the prosecution presented no evidence of new facts upon which the additional charges would have been based. He further claims that the government added the charges against him because he refused to respond to a government letter demanding that all pleas be completed by a certain date and because he filed numerous motions and sought judicial sanctions against government counsel because of alleged improprieties.
 
 
 163
 Myers' reply brief presents a slightly different attack. Acknowledging the prosecutor's affidavit for the first time in his reply brief, Myers contends that because the prosecutor's affidavit admits that at least some of the facts contributing to the superseding indictment were available to the government when the original indictment was obtained, there was a compelling appearance of vindictive prosecution which necessitated at least an evidentiary hearing. Although Myers unsuccessfully requested an evidentiary hearing below, he raises the issue of such a hearing for the first time on appeal in his reply brief.
 
 
 164
 Myers relies on Blackledge v. Perry, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), Jackson v. Walker, 585 F.2d 139 (5th Cir. 1978), and Hardwick v. Doolittle, 558 F.2d 292 (5th Cir. 1977), cert. denied, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978). Blackledge established that a prosecutor's discretion to reindict a defendant is circumscribed by the due process clause. In Blackledge a defendant was convicted of a misdemeanor and pursued his statutory right to a trial de novo in a higher court. The prosecutor obtained a superseding indictment charging the defendant on a felony charge based on the same act as the misdemeanor charge, but the Supreme Court held that the due process clause prohibited the substitution of the more serious charge for the lesser. The Court emphasized that the rationale of the decision was not that actual retaliatory motivation existed. Rather, the reasonable apprehension of vindictiveness, even without a showing of actual retaliatory motive, was by itself sufficient to establish a due process violation.
 
 
 165
 In Hardwick v. Doolittle, supra, 558 F.2d 292, the defendant was originally indicted on two counts: bank robbery and assault on policemen. The defendant appealed but before his retrial a new prosecutor obtained a superseding indictment which added two counts which arose from the same robbery: assault on a bank customer and robbery of another bank customer. The Hardwick Court held that the apprehension of vindictiveness, in the absence of a determination of actual vindictiveness, established only prima facie proof of a due process violation; the appearance of vindictiveness shifted the burden onto the Government to prove that no actual vindictiveness existed.[70] The Court stated that
 
 
 166
 once a prosecutor exercises his discretion to bring certain charges against a defendant, neither he nor his successor may, without explanation, increase the number of or severity of those charges in circumstances which suggest that the increase is retaliation for the defendant's assertion of statutory or constitutional rights.
 
 
 167
 Id. at 301. The Court held that the prosecutor could rebut the prima facie proof or appearance of vindictiveness by establishing that his reasons for adding the new charge were other than to punish the defendant for exercising his rights. The Court noted that a prosecutor's lack of vindictiveness in increasing the severity or number of charges can be easily shown when there is good reason for the increase, such as when there is new evidence or evidence of additional crimes that was not obtained until after the first indictment was filed. See id. at 301 & n.6. Blackledge was distinguished on the ground that it involved substitution of a more serious charge for the same criminal act (assault) whereas Hardwick concerned discretionary prosecutorial decisions about whether to initiate prosecution for different and distinct criminal acts. Id. at 301. The Hardwick Court stated that the charges in that case "were not harsher variations of the same original decision to prosecute as in Blackledge." Id. at 302.
 
 
 168
 This Court in Jackson v. Walker, supra, 585 F.2d 139, reconciled the apparent inconsistency between Blackledge and Hardwick.[71] The Jackson Court stated that the apparent conflict between Blackledge and Hardwick is explained by the absence of a strong countervailing policy in Blackledge of allowing prosecutorial freedom in bringing new charges. Id. at 144. There were no other crimes in Blackledge as there were in Hardwick. The Jackson Court read Blackledge and Hardwick as applying the same threshold balancing test:
 
 
 169
 In deciding whether (a finding of a due process violation requires) a showing of actual vindictiveness or merely a showing of reasonable apprehension of vindictiveness, a court must weigh the extent to which allowing the second indictment will chill the exercise of the defendants' appeal rights against the extent to which forbidding the second indictment will infringe on the exercise of the prosecutor's independent discretion. In other words, the court must weigh the need to give defendants freedom to decide whether to appeal against the need to give the prosecutors freedom to decide whether to prosecute.
 
 
 170
 Id. at 145.
 
 
 171
 Although the three cases discussed above concerned situations in which a prosecutor reindicted a defendant on increased charges after a prior trial, the analysis utilized in those cases has been applied where a superseding indictment containing increased charges is returned prior to trial. In United States v. Jones, 587 F.2d 802, 805 (5th Cir. 1979), the defendant claimed that his reindictment on additional counts, after he had pled not guilty to the original indictment, violated due process. The defendant's claim was not successful because he did not allege actual vindictiveness and because the reindictment was sought solely because of newly discovered evidence. Id. at 805 & n.1. Thus the superseding indictment established on its face only an appearance of vindictiveness or a prima facie case of vindictiveness, and the prosecutor was entitled to the opportunity to explain the reindictment. Id.
 
 
 172
 In this case the prosecutor rebutted that prima facie case by establishing that the basis for the superseding indictment was newly discovered evidence, not prosecutorial vindictiveness for Myers' assertion of his rights.[72] See id.; Jackson v. Walker, supra, 585 F.2d at 146; Hardwick v. Doolittle, supra, 558 F.2d at 301; see also Miracle v. Estelle, supra, 592 F.2d at 1277 & n.14.
 
 
 173
 Myers' claim that the trial court erred by failing to grant an evidentiary hearing is without merit. There was in camera review below of Keller's testimony before the grand jury and of the affidavits of counsel concerning the additional charges contained in the superseding indictment.
 
 
 174
 We have independently reviewed the evidence and testimony presented to the grand jury, including Keller's testimony, and conclude that there was sufficient new evidence presented to support the new charges against Myers in the superseding indictment.
 
 VIII. MOTION TO SUPPRESS[73]
 
 175
 Grant filed a motion to suppress photographs of weapons seized from the trunk of his car by federal agents. The trial court found that Grant was not illegally seized and that he voluntarily consented to the search of his car trunk, and denied Grant's motion.[74]
 
 
 176
 DEA Agent Eaton testified at a pretrial hearing before a magistrate concerning the seizure of the guns. He testified that he and FBI Agent Sams were conducting surveillance of Grant based on information supplied by an informant, George Purvis. On April 5, 1978, the two agents went to the Placid Lakes Airport near Lake Placid, Florida, because Purvis had told them that he had been instructed by Grant, Platshorn and Meinster to commandeer a plane in which he would be flying with two other persons and to land at that airport. Grant was to be present at the airport with radio and monitoring equipment, smoke grenades, machine guns, and a night scope.
 
 
 177
 After the agents had observed Grant at the airport for about two uneventful hours, Grant drove from the airport and stopped at a convenience store. While Grant was inside the store, Agents Eaton and Sams pulled their car alongside Grant's car. Sams got out of his car and looked into the windows of Grant's car. Grant then ran from the store towards Sams and yelled at Sams, "What are you doing with my car?" Eaton testified that Grant then "started running towards (Sams) in kind of an aggressive manner." Eaton then stepped from his car and told Grant to stop. Eaton testified that Grant then "started reaching into his right pants pocket." Eaton further testified that "I thought he might be reaching for a weapon." As Grant proceeded towards Sams, Eaton pulled his gun and pointed it at Grant. Eaton testified that he told Grant "not to move again or reach in his pocket again, or I would blow him away." Eaton stated that he then told Grant to step back on the curb; Grant did so and put his hands up.
 
 
 178
 Eaton testified that Grant at that point said something to the effect of "Are you cops," and "If you are looking for guns, I have got weapons in the trunk." Eaton testified that Grant then said, "I'll show them to you if you want, because they are legal." Eaton testified that he told Grant that he and Sams were police. Eaton radioed for two other federal agents participating in the surveillance to join them. Eaton then stated that he and Sams would like to look at the weapons and asked if Grant would come around to the trunk. Grant and the two agents briefly stood waiting beside the trunk until the other two agents arrived. Eaton still held the gun, but he held it at his side and did not point it at Grant. After the other agents arrived, one of them asked Grant if he would show the guns to the agents and Grant opened the trunk. The agents immediately saw machine guns in the trunk. Also in the trunk were smoke grenades, ammunition clips for the semi-automatic weapons and a night scope.
 
 
 179
 Grant told the agents that the guns were not automatic but rather semi-automatic weapons and that he had a legal right to them. The agents believed that the weapons were illegal and confiscated them. The agents later learned that the guns were in fact semi-automatic and that it was legal for Grant to possess those guns. The guns were returned to Grant a few days later. Grant was never frisked or searched or taken into custody.
 
 
 180
 The district court found that "the agents acted reasonably and therefore legally in stopping Grant." The court reasoned that the stop of Grant was merely intended to neutralize what appeared to be an immediate threat of physical harm to a fellow agent and was not an arrest. The court relied upon Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that whether a particular search or seizure is reasonable in light of the particular circumstances is to be tested against an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Id. at 21-22, 88 S.Ct. at 1879-1880. The district court found that Eaton's initial stop of Grant was objectively reasonable and thus legal, regardless of whether Eaton had probable cause to arrest Grant at that time.[75] The trial court noted that Eaton testified that he had been told earlier by Purvis that Grant had on occasion carried a pistol in his pocket.
 
 
 181
 The trial court also found that the search of the trunk was legitimized by Grant's voluntary consent. The court first stated that the consent was not "tainted" by the stop of Grant because that stop was legal. The court acknowledged that, although the fact that Grant voluntarily consented at gunpoint is a "single factor (that) sounds very powerful at first," the particular circumstances in this case demonstrate that Grant's consent was in fact voluntary. The court stressed that Grant spontaneously volunteered the information that he had guns in his trunk and that the agents could look at them. The court noted that there was no questioning or request by the agents preceding Grant's consent. The court also emphasized that Grant knew that he legally possessed the guns and apparently believed that the guns could not otherwise incriminate him.
 
 
 182
 Grant contends on appeal that he was "seized" because under the totality of these circumstances he thought that he was not free to leave. He emphasized that he was held at gunpoint and that the gun remained drawn. He asserts that his seizure was illegal because it was not supported by probable cause or reasonable suspicion. Secondly, Grant argues that his consent was invalid on two grounds: it was not voluntary because it was given at gunpoint, and the taint of such consent by the initial illegal stop had not dissipated. Grant urges that admission of the photographs into evidence was reversible error because of the prejudicial effect of admission of that evidence upon him.[76]
 
 
 183
 We agree with the district court that, under the unusual circumstances of the stop of Grant, the stop was legal. The stop was for the limited, immediate purpose of protecting another law enforcement officer from an apparent imminent physical threat to his safety. The stop was not an investigatory stop-no questions were asked of Grant-and there was no subsequent frisk of Grant. We believe that the stop or seizure of Grant was objectively reasonable in light of the particular circumstances and that the agent was justified in taking the limited action. See Terry v. Ohio, supra, 392 U.S. at 21-22, 88 S.Ct. at 1879-1880.
 
 
 184
 We further conclude that the district court's finding that Grant's consent was voluntary under the unique, total circumstances of the stop and search was not clearly erroneous.
 
 The Supreme Court recently stated:
 
 185
 The question whether (a defendant's) consent ... was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances, Schneckloth v. Bustamonte, (412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)), and is a matter which the Government has the burden of proving. Id., at 222 (93 S.Ct. at 2045), citing Bumper v. North Carolina, 391 U.S. 543, 548 (, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797) ((1968)).
 
 
 186
 United States v. Mendenhall, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980). The trial court's actual determinations of the credibility of witnesses and the voluntariness of the defendant's consent will not be reversed on appeal unless clearly erroneous. United States v. Turner, 628 F.2d 461, 465 (5th Cir. 1980); see United States v. Bowles, 625 F.2d 526, 536 (5th Cir. 1980); United States v. Robinson, 625 F.2d 1211, 1218 (5th Cir. 1980).
 
 
 187
 Among the factors considered in evaluating whether a defendant's consent was in fact voluntary-none of which is a controlling factor-are voluntariness of the defendant's custodial status,[77] the presence of coercive police procedure,[78] the extent and level of the defendant's cooperation with police,[79] the defendant's awareness of his right to refuse to consent to the search,[80] the defendant's education and intelligence,[81] and, significantly, the defendant's belief that no incriminating evidence will be found.[82]
 
 
 188
 We stress that the circumstances in this case are unique and that it is most unusual that consent given at gunpoint can ever be found to be voluntary. However, in this situation, Grant spontaneously volunteered the information that he had weapons in his trunk. He was not responding to any questioning or interrogation. Moreover, Grant knew that his possession of the weapons was legal and thus he apparently believed that such possession would not incriminate him. United States v. Hall, supra, 565 F.2d at 921.
 
 
 189
 Because the initial stop was not illegal, there was no subsequent tainting of Grant's consent. See United States v. Allison, supra, 616 F.2d at 782.
 
 
 190
 Even if denial of the motion to suppress were error, admission of the photographs into evidence could have had no perceptible effect upon the jury's verdict. The jury was informed that Grant had a legal right to possess the weapons that were depicted in the photographs. Moreover, Grant was acquitted of the substantive counts for which the proof of his weapons' possession was directly relevant, i. e., those counts which related to attempted importation of drugs at Lake Placid in April 1978. There was other unchallenged evidence of Grant's incriminatory conduct as well as his possession of guns or ammunition. Any error by the trial court in admitting the photographs into evidence was harmless beyond a reasonable doubt. See Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).
 
 IX. EVIDENTIARY RULINGS
 
 191
 A. Alleged Government Suppression of Material Evidence and Knowing Use of Perjured Testimony
 
 
 192
 Appellant Myers urges that his conviction should be reversed because the Government made use of alleged perjured testimony by Jiminez concerning an alleged subpoena. Jiminez testified that sometime between December 1977 and February 1978 he was present at a meeting of certain persons associated with a company named Inter-Air Services during which a subpoena for flight plans and Inter-Air records was discussed. Jiminez stated that also in attendance were Myers and two persons named Mattaway and Sosha. Jiminez testified that Sosha stated that a particular flight plan of a flight by Platshorn to Palm Springs should not be provided to the "Federal Grand Jury." Jiminez testified that he thought that that subpoena had been issued by the Miami grand jury. Jiminez further testified that Myers stated that the decision whether to produce the flight plan should be left to Sosha and that Sosha in turn decided that Mattaway's attorney should make an excuse for failure to produce the subpoena. Jiminez also testified that the Palm Springs flight plan was "disposed of" at that meeting.
 
 
 193
 Testifying for the defense, Mattaway stated that he had never received a subpoena from a Miami grand jury during the period December 1977 to February 1978, although he admitted that he had received and complied with a North Carolina grand jury subpoena requesting Inter-Air records. However, Myers' motion in the alternative to dismiss the indictment or to strike Jiminez's testimony because of Jiminez's alleged perjured testimony made reference to Myers' Exhibit # 3 which "showed a grand jury subpoena issued in March, 1978 to Inter-Air Services for plane-leasing records which were to be turned over to a grand jury in Miami." Mattaway testified that the government never followed up on that subpoena.
 
 
 194
 Myers requested that the Government produce the alleged Miami grand jury subpoena to which Jiminez referred as having been issued sometime during December 1977 to February 1978, but the Government did not produce the alleged subpoena. The Government had elicited the testimony from Jiminez concerning the destruction of the Palm Springs flight plan in order to show that Myers had not, as he claimed, withdrawn from the Black Tuna conspiracy in September 1977. Myers argues that the Government violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to produce the subpoena or to state that the subpoena did not exist and that the Government knowingly used the perjured testimony of Jiminez to the effect that the subpoena existed. Myers asserts that the non-existence of the subpoena was exculpatory evidence. He stresses the significance of the issue of the existence of the subpoena because the alleged destruction of Inter-Air records was in part the basis for the Government's claim that Myers continued in the conspiracy after September 1977 and for its attempted impeachment of Mattaway.
 
 
 195
 The Government responds that what Myers characterizes as an issue of intentional suppression of material evidence or of use of perjured testimony is instead an issue of credibility. The Government contends that the existence of the alleged subpoena has no bearing upon what Jiminez claims that he heard, since Jiminez never stated that he actually saw the subpoena, and thus there was no perjured testimony for the Government to correct. The Government asserts that Jiminez may have been mistaken about the time that the meeting in question occurred, suggesting that the meeting in question might have taken place at a later date. The Government suggests that the conversation at issue might easily have referred to the March 1978 subpoena seeking plane-leasing records. The Government also notes that the North Carolina grand jury later issued a subpoena to Inter-Air and suggests that Jiminez may simply have been incorrect in his belief that the subpoena at issue came from the Miami grand jury rather than from the North Carolina grand jury.
 
 
 196
 In order to establish a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defendants must prove the following elements: (1) the prosecution suppressed or withheld evidence (2) which is favorable and (3) material to the defense. Moore v. Illinois, 408 U.S. 786, 794-95, 92 S.Ct. 2562, 2567-68, 33 L.Ed.2d 706 (1972); Ogle v. Estelle, 641 F.2d 1122, 1124 (5th Cir. 1981); United States v. Auten, 632 F.2d 478, 481 (5th Cir. 1980); United States v. Anderson, 574 F.2d 1347, 1353 (5th Cir. 1978).
 
 
 197
 With respect to the second element, Brady requires disclosure of evidence favorable to the defendant both on the issue of guilt and for purposes of impeachment of an adverse witness. United States v. Auten, supra, 632 F.2d at 482. The third element, materiality,
 
 
 198
 is weighed against one of four distinct situational standards: (1) the prosecutor has not disclosed evidence when there has been a specific request, (2) the prosecutor has not disclosed information when there has been a general request or no request, (3) the prosecutor knows or should have known that the conviction is based on false evidence, and (4) the prosecutor fails to disclose, in the absence of a specific request, evidence which is relevant only for impeachment.
 
 
 199
 Id., citing United States v. Anderson, supra, 574 F.2d at 1353.
 
 
 200
 When the prosecutor has not disclosed information despite a specific request, the standard of materiality is whether the suppressed evidence might have affected the outcome of the trial. United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980).
 
 
 201
 When the prosecution knows or should know that the conviction is based in part on false or perjured evidence, the standard of materiality is whether it is reasonably likely that the truth would have affected the outcome of the trial, i. e., whether the jury would have reached a different verdict. United States v. Agurs, supra, 427 U.S. at 103, 96 S.Ct. at 2397; Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1971); United States v. Auten, supra, 632 F.2d at 482; United States v. Anderson, supra, 574 F.2d at 1355.
 
 
 202
 When the prosecutor has failed to disclose purely impeaching evidence, despite a specific request, the defendant must demonstrate that such evidence probably would have resulted in an acquittal. Ogle v. Estelle, supra, 641 F.2d 1125; United States v. Anderson, supra, 574 F.2d at 1354.
 
 
 203
 There was no showing in this case that the government attorneys intentionally used perjured testimony or knew that Jiminez had willfully testified falsely. Furthermore, there is no showing that the government attorneys withheld a subpoena from the defense or that a Miami grand jury subpoena was ever in existence. We agree with the Government that the issue raised by Myers with respect to Jiminez's testimony concerning what he overheard about a federal grand jury subpoena is an issue of Jiminez's credibility. Assessment of the credibility of a witness is of course a function solely within the province of the jury. United States v. Hoffa, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966); United States v. McCrary, 643 F.2d 323, 328 (5th Cir. 1981). Jiminez did not claim to have seen the subpoena that was discussed at the meeting in question. It could very well be that Jiminez overheard a discussion about a subpoena that was issued by the North Carolina grand jury and answered by Mattaway, or about the March 1978 subpoena seeking plane-leasing records, and that he was mistaken about the exact time that the meeting in question occurred.
 
 B. Coconspirator Hearsay Statements
 
 204
 Meinster in a contention adopted by other appellants, complains that the trial court committed reversible error by admitting a number of coconspirator hearsay statements. He claims that those statements were not admissible under Fed.R.Evid. 801(d)(2)(E), which provides that a statement made by a coconspirator of a party during the course of and in furtherance of the conspiracy is not hearsay. Virtually all of the statements complained about were related in the testimony of government witness Jiminez. Meinster essentially complains that the statements admitted by the trial court were mere casual, retrospective comments made in conversations about past events and thus were not "in furtherance" of the conspiracy.
 
 
 205
 Many of the particular statements objected to on appeal were not objected to below at the time they were made or were objected to on grounds other than that they were inadmissible as coconspirator admissions under Rule 801(d)(2)(E). Discussion of those statements is unnecessary.[83] In the absence of plain error, hearsay that is not properly objected to is ordinarily admissible at trial for any relevant purpose and may be considered by the jury to the extent of its probative value. E. g., United States v. Gresham, 585 F.2d 103, 106 (5th Cir. 1978); United States v. Leaman, 546 F.2d 148, 150 (5th Cir.), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977).
 
 
 206
 Some statements objected to on appeal by Meinster were ordered stricken immediately after the witness related those statements.
 
 
 207
 Certain other statements objected to were made by Keller to Jiminez and concerned Keller's past transports of marijuana to Meinster in Philadelphia. Admission of those statements, however, even if improper under Rule 801(d)(2) (E), was harmless error because Keller himself testified concerning those same transports.
 
 
 208
 One statement challenged by Meinster was made by Myers to Jiminez to the effect that a Latin-American drug dealer named Sanchez had called Platshorn and threatened to ship Platshorn's son's head to Colombia unless Sanchez's organization received payment with respect to a marijuana deal. That statement made by Myers to Jiminez was made approximately one year after the incident referred to in the statement.
 
 
 209
 We agree with Meinster that this statement was not in furtherance of the conspiracy; it was a retrospective statement. See United States v. Lieberman, 637 F.2d 95, 102-03 (2d Cir. 1980). The statement by Myers was apparently not made to Jiminez in order to convince Jiminez to continue working in furtherance of the conspiracy. The statement relating to the alleged threat to Platshorn's son did not have the purpose of furthering Myers' or Jiminez's involvement in the conspiracy. Although the phrase "in furtherance of the conspiracy" must not be applied too strictly lest the purpose of Rule 801(d) (2)(E) be defeated, mere idle conversation between coconspirators is not admissible under that rule. United States v. James, 510 F.2d 546, 549 (5th Cir. 1975).
 
 
 210
 Although Myers' statement was improperly admitted, in light of the overwhelming evidence against appellants, we conclude that the error was harmless beyond a reasonable doubt.[84]
 
 
 211
 We have carefully reviewed each of the 30 examples of allegedly inadmissible hearsay statements cited by Meinster. The trial court committed no reversible error.
 
 C. Refusal to Strike Witness Testimony
 
 212
 Meinster urges that the trial court committed reversible error by failing to strike the entire testimony of government witness Keller after Keller invoked his Fifth Amendment privilege against self-incrimination in response to defense cross-examination, and by failing to grant a mistrial at that time based on the denial of his right to confront an adverse witness. Keller refused to answer cross-examination questions concerning: (1) the name of a friend who operated a complete cocaine laboratory; (2) the name of a separate friend who introduced Keller to a drug dealer named Vaughan who had been Keller's associate and who had been involved in drug deals with Platshorn and Meinster; (3) the name of a person who owned a house used by Keller as a "stash house"; and (4) whether Keller had any persons working for him at a warehouse.
 
 
 213
 Where a witness has legitimately invoked the privilege, his direct testimony must be struck only if the defendants' inability to complete their inquiry created a "substantial danger of prejudice by depriving (them) of the ability to test the truth of the witness's direct testimony." Fountain v. United States, 384 F.2d 624, 628 (5th Cir.), cert. denied, 390 U.S. 1005 (88 S.Ct. 1246, 20 L.Ed.2d 105). It is generally only where the witness refuses to answer on "direct" as opposed to "collateral" matters that his direct testimony must be excised. Id.
 
 
 214
 United States v. Diecidue, 603 F.2d 535, 552 (5th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). See Dunbar v. Harris, 612 F.2d 690, 692-693 (2d Cir. 1979). The Diecidue Court further held that, where the defense cross-examination is focused on undermining the credibility of the witness and the questions to which the witness declines to respond relate to collateral matters, refusal of the trial court to strike the direct testimony is not erroneous if the responses elicited would have been mere cumulative evidence concerning the witness's credibility. Diecidue, supra, 603 F.2d at 552.
 
 
 215
 Meinster argues first that the cross-examination did not concern collateral matters. Second, he argues that the questioning was not aimed solely at impeaching Keller but rather was also intended to support the defense strategy of shifting culpability away from Meinster toward Keller and his associates by demonstrating that the Government was minimizing Keller's role in prior drug dealings and maximizing Meinster's culpability.
 
 
 216
 We agree with the Government that the questions posed by defense counsel related to collateral matters. Furthermore, we conclude that the questioning was essentially aimed at impeaching Keller's credibility by emphasizing that he was a government witness who had received favorable deals from the prosecution and by showing that he had been extensively involved in drug dealings. The record reflects that defense counsel cross-examined Keller at considerable length concerning his prior dealings in marijuana. Appellants were not prejudiced by Keller's exercise of his Fifth Amendment privilege.
 
 D. References to Polygraph Tests
 
 217
 Meinster contends that the trial court erred by failing to declare a mistrial because Jiminez twice improperly offered, during cross-examination, to take a polygraph test.[85] The trial court denied Meinster's motion for a mistrial and instructed the jury to disregard any references to lie detector tests, stating that the results of such tests are inadmissible into evidence. Jiminez's references to a polygraph test were improper, but they were not so prejudicial that the jury's verdict was measurably affected. Any prejudice was cured by the instructions.
 
 E. Evidence of False Driver's License
 
 218
 Myers argues that the trial court committed reversible error by improperly permitting introduction of evidence that he procured a false driver's license. Myers' contention is that evidence of the license was evidence of an extrinsic offense that was inadmissible under Fed.R.Evid. 404(b).[86] The Government offered in evidence a driver's license in the name of Frank Artino, bearing Myers' photograph. The Government's proof demonstrated that Myers had a telephone listed under the name of Frank Artino and that toll records showed that calls had been received at that number from telephones belonging to other members of the Black Tuna organization. The government attorney stated at trial that evidence of Myers' possession of the driver's license was introduced as a predicate for the foundation of evidence of telephone calls between the telephone listed in Frank Artino's name and Jiminez and Inter-Air Services.
 
 
 219
 Myers asserts that the evidence of the false license was not admitted in order to prove interest and that the identity exception to Rule 404(b) is inapplicable because Myers' participation in the conspiracy was established by Jiminez's testimony.
 
 
 220
 We conclude that the evidence of the license was admissible under Rule 404(b) because it was relevant to prove identity. Although Jiminez testified that Myers was a member of the conspiracy, that testimony alone did not establish that Myers used the alias Frank Artino. Myers' counsel declined to stipulate that Myers used that alias. Evidence of the false driver's license demonstrated that Myers was the same person as Frank Artino, which was relevant to telephone calls made by other Black Tuna members to and from the telephone number listed in Artino's name. The evidence of the driver's license was thus admissible as tending to prove the offense charged in the indictment.
 
 X. PROSECUTOR'S CLOSING ARGUMENT
 
 221
 Grant cites several instances of alleged impropriety in the prosecutor's closing argument. He complains that the prosecutor, Mr. Schroeder (1) twice vouched for the credibility of government witnesses;[87] (2) attempted to mislead the jury concerning its function as an impartial body by appealing to the jury to place itself in the position of government witnesses;[88] (3) implied that the government would not have brought the case unless the defendants were guilty;[89] (4) attempted to coerce the jury into returning convictions based upon passion rather than upon the evidence before them by appealing to them to act on behalf of the community in stopping crime;[90] and (5) implied that the Black Tuna organization was extant at the time of trial, thereby injecting into his argument extrinsic and prejudicial matters that had no basis in the record.[91]
 
 
 222
 As this Court recently stated, "(t)he test in determining the existence of prosecutorial misconduct regarding closing arguments is whether the remarks were improper and whether they prejudicially affected substantial rights of the defendants." United States v. Dorr, 636 F.2d 117, 120 (5th Cir. 1981); see United States v. Garza, 608 F.2d 659, 663 (5th Cir. 1979); United States v. Corona, 551 F.2d 1386, 1388 (5th Cir. 1977). Although we agree with Grant that the prosecutor's comments were improper,[92] we conclude that these remarks did not prejudicially affect substantial rights of the appellants and thus did not constitute reversible error.
 
 
 223
 It is well settled that a prosecutor may not personally vouch for the credibility of government witnesses. United States v. Grapp, 653 F.2d 189, 195 (5th Cir. 1981); United States v. Garza, 608 F.2d 659, 663 (5th Cir. 1979); United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978). The prosecutor is limited to pointing out to the jury his contentions about what conclusions the jury may draw from the evidence, because "(t)he sole purpose of closing argument is to assist the jury in analyzing, evaluating and applying the evidence." United States v. Dorr, supra, 636 F.2d at 120; see United States v. Grapp, supra, 653 F.2d at 195; United States v. Garza, supra, 608 F.2d at 662-63; United States v. Morris, supra, 568 F.2d at 401.
 
 
 224
 It is also well settled that a prosecutor may not imply that the government would not have brought the case unless the defendants were guilty. United States v. Morris, supra, 568 F.2d at 401. A prosecutor may not attempt to invoke the sanction of his office or the government itself as a basis for conviction. United States v. Garza, supra, 608 F.2d at 663; Hall v. United States, 419 F.2d 582, 583-84 (5th Cir. 1969); see Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934).
 
 
 225
 Generally, a prosecutor is prohibited from seeking to obtain a conviction by going beyond the evidence before the jury. United States v. Dorr, supra, 636 F.2d at 120; United States v. Garza, 608 F.2d at 663; United States v. Morris, supra, 568 F.2d at 401 "(A)n attorney may not inject into his argument any extrinsic or prejudicial matter that has no basis in the evidence." United States v. Morris, supra, 568 F.2d at 401. A prosecutor is also forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury. Berger v. United States, supra, 295 U.S. at 85, 55 S.Ct. at 632; United States v. Corona, supra, 551 F.2d at 1390. A prosecutor may not make an appeal to the jury that is "directed to passion or prejudice rather than to an understanding of the facts and of the law." United States ex rel. Perry v. Mulligan, 544 F.2d 674, 680 (3d Cir. 1976), cert. denied, 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). However, "(u)nless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible ...." United States v. Lewis, 547 F.2d 1030, 1037 (8th Cir. 1976), cert. denied, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977); see also United States v. Hawkins, 595 F.2d 751, 754-55 (D.C.Cir.), cert. denied, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979).
 
 
 226
 "In determining the overall degree of prejudice in a prosecutor's closing argument, an appellate court may consider the district court's jury instruction and the strength of the evidence against each defendant." United States v. Dorr, supra, 636 F.2d at 121. The court below instructed the jury that the arguments of counsel were not evidence upon which a verdict could be based. We have considered the prosecutor's misstatements in light of the quantum of evidence against each appellant, and conclude that none of the appellants' substantial rights was prejudiced.
 
 XI. SUFFICIENCY OF THE EVIDENCE[93]
 
 227
 Appellants Myers and Fisher contend that the evidence was insufficient to support their convictions on certain counts.
 
 A. Myers
 
 228
 Myers was convicted on eight counts of the superseding indictment, including the two RICO counts, a § 848 continuing criminal enterprise count, and five substantive counts-Counts 5, 6, 7, 8 and 15. Myers contends that the evidence was insufficient to support his convictions on Counts 5 through 8 and on the § 848 count, and thus he claims that the trial court erred in denying his motion for judgment of acquittal on those counts.
 
 
 229
 Myers' first claim is that his conviction on Count 5, charging importation and aiding and abetting importation in the Punta Gorda incident, is invalid because of lack of "jurisdiction." He argues that because the locus of the landing field is in the Middle District of Florida prosecution in the Southern District was improper. This contention is in essence a challenge on the basis of improper venue. It is premised on the assumption that the importation came to an end when the aircraft landed at the airport at Punta Gorda and that the importation did not continue as the marijuana was delivered by truck to Miami. Myers' contention is answered by United States v. Gray, 626 F.2d 494 (5th Cir.), cert. denied, 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), in which this Court held that "importation of a controlled substance in violation of 21 U.S.C. § 952(a) is a 'continuous crime' that is not complete until the controlled substance reaches its final destination point, and that venue is proper in any district along the way." Id. at 498; see United States v. Godwin, 546 F.2d 145 (5th Cir. 1977). The final destination point for the Punta Gorda load was Miami, not Punta Gorda.
 
 
 230
 Count 6 charged a violation of 21 U.S.C.A. § 843(b), use of a communications facility (telephone) to facilitate the commission of a narcotics felony. The phone conversation at issue was one between Myers and Meinster on the evening of the San Marino incident. The only government witness to testify regarding Count 6 was Jiminez. Myers argues that the discrepancies and inconsistencies in Jiminez's testimony about his recollection of the telephone call, in addition to the "blatant legal insufficiency" of his trial testimony, necessitated a judgment of acquittal.
 
 
 231
 On the evening of the San Marino incident, in which 16,000 pounds of marijuana were seized at the San Marino residence, Myers and Jiminez were together with two other persons on the houseboat BEAM'S POST TIME which was docked near the Fontainebleau Hotel. During the dinner hour, Myers received a number of telephone calls. The four persons then went to a suite at the Fontainebleau Hotel. About 10:30 p. m. Myers engaged in another conversation after which he told Jiminez that he had just advised Meinster that everything was secure at San Marino. On cross-examination concerning that phone conversation, Jiminez admitted changing his testimony. In July 1978 he stated that Meinster had called Myers; in July 1979 he stated that he was not sure whether Meinster or Myers had placed the call. At trial he testified that Myers received the call from Meinster.
 
 
 232
 Myers' complaint about the inconsistencies in Jiminez's testimony is nothing more than an attack on Jiminez's credibility. The issue of the credibility of a witness' testimony is a matter solely for determination by the jury. United States v. Hoffa, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966); United States v. McCrary, 643 F.2d 323, 328 (5th Cir. 1981); United States v. De Los Santos, 625 F.2d 62, 65 (5th Cir. 1980).
 
 
 233
 Myers also asserts that his mere statement that "everything is secured at San Marino" is insufficient to constitute a facilitation of a felony because it is merely a reference to certain activities. He asserts that the jury was forced to speculate and hypothesize in order to infer that "everything" referred to felonious activity. He claims that the Government did not prove that his statement had an unlawful purpose.
 
 
 234
 In order to prove a violation of 21 U.S.C.A. § 843(b), the Government must establish that the defendant knowingly and intentionally used a communications facility, e. g., a telephone, to facilitate the commission of a narcotics offense. United States v. Rey, 641 F.2d 222, 224 n.6 (5th Cir. 1981). In order to establish the facilitation element, the Government must show that the telephone call comes within the common meaning of facilitate-"to make easier" or less difficult, or to assist or aid. United States v. Watson, 594 F.2d 1330, 1343 (10th Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979). It is sufficient if a defendant's use of a telephone to facilitate the possession or distribution of controlled substances facilitates either his own or another person's possession or distribution. Id. at 1342 n.14.
 
 
 235
 The Government argues that the telephone exchange between Myers and Meinster, both of whom the Government characterizes as supervisors of the enterprise, with one giving assurances to the other about the security of a large quantity of concealed marijuana that was at that time being protected by underlings in the enterprise, facilitated the unlawful possession or attempted distribution of the marijuana. The Government notes that the actual distribution of the load was imminent at the time of the telephone call.
 
 
 236
 We conclude that the evidence, taken in context and in its totality, was sufficient to permit the jury to find Myers guilty. Myers' connection with the San Marino load of marijuana was circumstantially evidenced by the presence of his fingerprints on a soft drink can and on several documents found at the time the marijuana was seized at the San Marino residence. The assurances given by Myers to Meinster about the resolution of the problem of quickly disposing of the eight tons of marijuana from the San Marino residence sufficiently facilitated the commission of the offense of possession with intent to distribute. There was thus a sufficient showing that Myers' conversation with Meinster had the unlawful purpose of facilitating the commission of the illegal possession with intent to distribute relating to the San Marino incident.
 
 
 237
 With respect to Count 7, which charged importation at San Marino, Myers argues that the Government presented no evidence that the marijuana was imported into the United States. However, Jiminez testified that Platshorn told him that Fisher had taken the marijuana off the mother ship, placed it on another boat, and transported it to the San Marino house. Additionally Richter testified that when he visited the San Marino house on the day of the seizure and saw bales of marijuana stacked to the ceiling he also saw three or four Colombian persons. One of those persons told Richter that he was from Colombia and that he came to San Marino by boat. He also testified that he had been assisting in carrying marijuana from the boat to the house.
 
 
 238
 In order to prove that a defendant imported controlled substances in violation of 21 U.S.C.A. § 952(a), the Government must establish that the defendant imported such substances "into the United States from any place outside thereof." United States v. Miranda, 593 F.2d 590, 596 (5th Cir. 1979). Proof of that element may be by circumstantial evidence. Id. at 596-97. While the mere size of the boat and the quantity of marijuana will not by themselves establish that the marijuana was imported into the United States, United States v. Soto, 591 F.2d 1091, 1104 (5th Cir.), cert. denied, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298, 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58 (1979); United States v. Maslanka, 501 F.2d 208, 216 (5th Cir. 1974), cert. denied, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975), that element may be established by evidence that a boat from which marijuana was unloaded went outside United States territorial waters or met with any other vessel that had-for example, a "mother ship." See United States v. Miranda, supra, 593 F.2d at 598; United States v. Maslanka, supra, 501 F.2d at 216.
 
 
 239
 Myers' essential contention concerning his convictions on Counts 7 and 8-the San Marino importation and possession charges-is that evidence of the presence of his fingerprints found on several documents and a soft drink can that were seized at the same time the marijuana was seized from the San Marino residence was insufficient to prove his connection with the San Marino load of marijuana. Myers argues that evidence of a defendant's fingerprints on movable objects found at the scene of the crime is insufficient to uphold a conviction unless there is additional proof to show that the fingerprints were impressed only during the commission of the crime. He claims that a reasonably minded jury must have reasonable doubt about his participation in the commission of the crimes charged in Counts 7 and 8. He also argues that the evidence of the fingerprints was inadmissible because there was no showing that they were impressed at the time of the crime.
 
 
 240
 The Government concedes that proof of the fingerprints standing alone would not have been sufficient to justify Myers' convictions on counts 7 and 8, since there was no direct proof that they were made in conjunction with the delivery of the eight-ton load to the San Marino house. However, the Government argues that the fingerprint evidence was relevant and admissible as circumstantial evidence of Myers' involvement and, together with other evidence, supported his conviction, citing United States v. Griffin, 483 F.2d 957, 958-59 (5th Cir. 1973). In Griffin, the defendant argued that certain fingerprint evidence was inadmissible because the Government's evidence did not reasonably exclude the hypothesis that the fingerprint was impressed at a time other than during the commission of the crime. This Court held that the fingerprint evidence was admissible as relevant and circumstantial evidence, emphasizing that the fingerprint evidence was not the only factor supporting the defendant's conviction. We conclude that the fingerprint evidence in the present case was admissible.
 
 
 241
 Other evidence in this case connected Myers with the San Marino incident. The Government characterizes Myers' statement that everything was secure at San Marino as an admission of involvement with the load of marijuana at the San Marino house at the time of the conversation. The Government notes that Myers made or received numerous telephone calls that evening and that the house had only one function-to serve as a "stash house" for shipments of marijuana. We conclude, accepting all reasonable inferences that tend to support the jury's verdict, that a jury could reasonably find that the evidence taken in context and as a whole was inconsistent with every reasonable hypothesis of innocence. See United States v. Griffin, supra, 483 F.2d at 958-59; United States v. Roustio, 455 F.2d 366, 370 (7th Cir. 1972).
 
 
 242
 Myers also challenges his § 848 continuing criminal enterprise conviction on the ground that none of the elements of § 848 was satisfied.[94] We have already concluded that Myers' convictions on Counts 5, 6, 7 and 8 were supported by sufficient evidence and thus the requisite series of at least three violations has been established. Additionally, Myers was found guilty on Count 15, an attempted importation charge arising out of the PRESIDENTIAL incident.
 
 
 243
 Myers further claims that the Government failed to prove that he undertook the continuing series of violations "in concert with five or more other persons with respect to whom (he) occupie(d) a position of organizer, a supervisory position, or any other position of management." 21 U.S.C.A. § 848(b)(2)(A). Myers attempts to avoid the disjunctive aspect of § 848(b)(2)(A): the defendant need only be shown to have organized, supervised or managed at least five other persons. United States v. Mannino, 635 F.2d 110, 116 (2d Cir. 1980). The same type of superior-subordinate relationship need not exist between the defendant and each of the other five persons. Id. at 117. Furthermore, the requisite five persons need not have acted in concert at the same time. United States v. Michel, 588 F.2d 986, 1000 n.14 (5th Cir. 1979). The Government is not required to prove that the defendant is the "single ringleader," as Myers claims.
 
 
 244
 The record reflects that Myers acted in the capacity of organizer, supervisor or manager with respect to at least five persons. Jiminez testified that Myers hired the foreman of the PRESIDENTIAL. Jiminez also testified that Myers told him that after Fisher and Echezerrata had refused to work as captain of the PRESIDENTIAL, Myers approached Platshorn and suggested that he (Myers) "should use his own people." Through the foreman's efforts a captain was recruited, who in turn brought in an engineer. One other crew member was also hired for the voyage. Although Myers personally hired only the foreman, we conclude that it can fairly be said that he "organized" the four persons who worked as the PRESIDENTIAL crew. Mere delegation by Myers of the authority to personally hire crew members to the ship's foreman does not detract from Myers' ultimate status as organizer. It does not matter that Myers did not have personal contact with the PRESIDENTIAL's crew so long as it was established that he occupied an organizational status with respect to those persons. See United States v. Bolts, 558 F.2d 316, 320 (5th Cir. 1977), cert. denied, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1978). Myers himself told Platshorn that he wanted to use "his (Myers') people" for the PRESIDENTIAL operation. Furthermore, Myers told Jiminez that he had been made a full partner for the PRESIDENTIAL operation.
 
 
 245
 Additionally, there was evidence that Myers supervised Jiminez in Platshorn's absence. Finally, there was evidence that two offloaders were engaged by Myers for the Punta Gorda importation and even though they offloaded the plane under the direct control of Keller, they nevertheless were, according to Keller's testimony, brought into the operation by Myers. Thus Myers organized those two persons. The evidence thus established that Myers organized, managed, or supervised at least five persons.
 
 
 246
 Finally, Myers claims that there was insufficient proof that he derived substantial income or resources from the continuing criminal enterprise. We need only make reference to the Punta Gorda incident. After viewing the evidence, direct and circumstantial, in the light most favorable to the government and accepting all reasonable inferences that tend to support the jury's verdict, we conclude that a jury could reasonably find that the evidence was inconsistent with every reasonable hypothesis of Myers' innocence with respect to the substantial income element.
 
 
 247
 Keller testified that Platshorn told him that the load smuggled from Colombia in the Punta Gorda operation contained approximately 3800 pounds of marijuana, which incidentally was less than expected because the plane which was used could carry approximately 6000 pounds. Keller testified that Myers told him that he was to receive one-fourth of the profits from the Punta Gorda operation. Myers also told Keller that he was being cheated out of a portion of his profit but that he would fly to Miami to talk to Platshorn and Meinster in order to resolve the dispute. Even if Myers was eventually deprived of his full one-fourth share of the profits, the evidence was sufficient to permit the jury to infer that Myers received substantial income from the 3800-pound load of marijuana. We do not agree with Myers' assertion that his statement that he was to receive a percentage of the profits is "irrelevant," nor do we agree with his claim that the inference that he would receive a percentage of the profits "if in fact a profit was generated" is a baseless inference.
 
 
 248
 Circumstantial evidence may suffice to prove a defendant's receipt of substantial income. See United States v. Bolts, supra, 558 F.2d at 321 ("testimony showed substantial amounts of money passing through the hands of the parties to the transactions"); United States v. Webster, 639 F.2d 174, 182 (4th Cir. 1981) (jury justified in concluding, on basis of evidence that large quantity of drugs moved in and out of defendant's possession, that defendant received substantial income from continuing criminal enterprise); see also United States v. Gantt, 617 F.2d 831, 847 (D.C.Cir.1980); United States v. Jeffers, 532 F.2d 1101, 116-17 (7th Cir. 1976), rev'd in part on other grounds, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); United States v. Sisca, 503 F.2d 1337, 1346 (2d Cir. 1974); United States v. Manfredi, 488 F.2d 588, 603 (2d Cir. 1973).
 
 B. Fisher
 
 249
 Fisher contends that the evidence was insufficient to support his convictions on Count 14, charging violation of 18 U.S.C.A. § 1952(a) (interstate or foreign travel or transportation in aid of racketeering enterprises), and on Count 15, aiding and abetting an attempt to import marijuana in violation of 21 U.S.C.A. § 963. Both counts related to the PRESIDENTIAL incident.
 
 
 250
 Count 14 charged that Fisher traveled in foreign commerce to carry on or facilitate the carrying on or importation of marijuana and thereafter, on or about September 3, 1977, performing acts facilitating that importation, in violation of 18 U.S.C.A. § 1952(a). Overt acts numbers 100 and 101, listed in Count 1 of the superseding indictment, stated that on or about August 31, 1977, the PRESIDENTIAL began to take on water and sink near the island of Great Abaco in the Bahama Islands, and the captain ran the yacht aground in order to prevent its sinking. Overt act number 102 stated that on or about August 31, 1977, Fisher left Fort Lauderdale in the BIG GLO II to rescue the marijuana from the sinking PRESIDENTIAL. In its response to Fisher's motion for a bill of particulars on Counts 14 and 15, the Government referred to the overt acts listed in Count 1.
 
 
 251
 The trial court instructed the jury that in order to convict Fisher on Count 14, the Government was required to prove that Fisher traveled in foreign commerce on or about the time and between the places charged in the indictment, with the specific intent at the time of such travel to promote or facilitate the unlawful activity, and that he thereafter knowingly and willfully performed or attempted to perform such activity. See United States v. Jones, 642 F.2d 909, 912 (5th Cir. 1981); United States v. Stevens, 612 F.2d 1226, 1231 (10th Cir. 1979). The court charged the jury that the term "foreign commerce" means transportation or movement between the United States and a foreign country.
 
 
 252
 Fisher claims that the evidence was insufficient to show that the place from which he departed on his salvage run to Abaco Island to recover marijuana from the grounded PRESIDENTIAL was within the United States. It is undisputed that Fisher and the vessel BIG GLO II, which was used in the recovery effort, were at Bimini on August 31 and September 1, 1977. Fisher claims that such evidence proved that he did not travel in foreign commerce because it demonstrated that he did not depart from the United States with the specific intent to facilitate the attempted importation of marijuana. Fisher also introduced evidence that he was fishing in the Bahamas on the first few days of September.
 
 
 253
 The Government's evidence consisted of the testimony of Jiminez. Jiminez testified that Fisher told him that he had been instructed by Platshorn to recover as much marijuana as possible from the PRESIDENTIAL and then to return to Fort Lauderdale. Fisher told Jiminez that he left on the vessel BIG GLO II from Striker Boat Yard, at Fort Lauderdale. Jiminez testified that Fisher told him that he had retrieved two bales of marijuana from the PRESIDENTIAL and that he had brought them back to Fort Lauderdale. During that conversation Fisher showed Jiminez some of the marijuana he had recovered. The Government introduced no evidence or testimony that Fisher was seen or known to have been in Fort Lauderdale on or about August 31, 1977.
 
 
 254
 Although Fisher insists that he is not asking this Court to pass on the credibility of a witness' testimony, that is essentially his claim. An appellate court will not review credibility choices made by a jury, even if it chose to believe an immunized coconspirator. Glasser v. United States, 315 U.S. 60, 77, 62 S.Ct. 457, 468, 86 L.Ed. 680 (1942); United States v. Walker, 613 F.2d 1349, 1352 (5th Cir.), cert. denied, 446 U.S. 944, 100 S.Ct. 2172, 64 L.Ed.2d 800 (1980).
 
 
 255
 The Government asserts that any variance between the date listed in the indictment as the date on which Fisher left Fort Lauderdale and the date on which he in fact did depart is in this instance immaterial.
 
 
 256
 A variance between allegations and proof is fatal only when it affects the substantial rights of the defendant by failing to sufficiently notify him of the charges against him so that he can prepare his defense and will not be surprised at trial. Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); United States v. Goss, 650 F.2d 1336, 1346 n.11 (5th Cir. 1981); United States v. Worthington, 642 F.2d 150, 152 (5th Cir. 1981); United States v. Georgalis, 631 F.2d 1199, 1205 (5th Cir. 1980). The Government's inability to prove the precise date does not demand a judgment of acquittal when there is sufficient evidence from which the jury could find the defendant guilty and the defendant had full opportunity to attack the absence of a precise date. United States v. Hall, 632 F.2d 500, 504 (5th Cir. 1980). The Government was not required to prove the exact date of Fisher's departure from Fort Lauderdale because it alleged only that he left "on or about" August 31, 1977; it was sufficient that the Government established some time reasonably near. United States v. Grapp, 653 F.2d 189, 195 (5th Cir. 1981); Russell v. United States, 429 F.2d 237, 238 (5th Cir. 1970). Proof of the acts charged on any date within the statute of limitations and before the return date of the indictment is sufficient to support a conviction under the travel act, 18 U.S.C.A. § 1952(a), provided that the variance between the date set forth in the indictment and the date actually proved does not expose the defendant to the possibility of a second prosecution for the same offense or prevent the preparation of an adequate defense by causing undue surprise. United States v. Somers, 496 F.2d 723, 745 (3d Cir.), cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). We have thoroughly reviewed the record and conclude that the failure of the Government to prove the exact date of Fisher's departure from Fort Lauderdale neither exposed Fisher to the possibility of a second prosecution for the same offense nor caused such surprise as to preclude him from adequately preparing his defense.
 
 
 257
 Count 15 charged Fisher with aiding and abetting an attempt to import 31,000 pounds of marijuana in the PRESIDENTIAL mission. Fisher claims that he was in no way connected with the PRESIDENTIAL voyage until the yacht ran aground. He notes the evidence that he had previously refused to captain the vessel. Fisher contends that the attempt to import the marijuana ended when the PRESIDENTIAL went aground and argues that his conviction on Count 15 must be reversed because one cannot aid and abet a completed crime. Roberts v. United States, 416 F.2d 1216, 1221 (5th Cir. 1969). He claims that the evidence shows that at most he was an accessory after the fact.[95] He also argues that the Government failed to prove the elements of an attempt.
 
 
 258
 Fisher's contentions are without merit because there was proof of an attempted importation, which by no means ended when the PRESIDENTIAL went aground. Even if the importation attempt by the PRESIDENTIAL crew ended when the vessel went aground, neither Fisher's efforts nor the efforts of the Black Tuna organization ended. In addition to Fisher's efforts, a helicopter carrying Grant flew over the PRESIDENTIAL but Grant was unable to drop a new bilge pump successfully. Because the attempted importation by Black Tuna members had not ended when Fisher's efforts were undertaken, he was an aider and abettor rather than an accessory after the fact. United States v. Barlow, 470 F.2d 1245, 1253 (D.C.Cir.1972) ("The very definition of the crime (of being an accessory after the fact) also requires that the felony not be in progress when the assistance is rendered because then he who renders assistance would aid in the commission of the offense and be guilty as a principal.").
 
 
 259
 The evidence applicable to Count 14, coupled with proof of Fisher's attempts by means of the BIG GLO II to attempt to remove marijuana from the grounded PRESIDENTIAL and his return afterwards to the Miami area, is sufficient to support Fisher's conviction on Count 15 as an aider and abettor. The Government proved that Fisher had a community of unlawful intent with the principals and that he willfully associated with the criminal venture and willfully participated in it as something that he wished to bring about. E. g., United States v. Bright, 630 F.2d 804, 813 (5th Cir. 1980).[96] The Government was not required to prove that Fisher participated in every phase of the criminal venture. United States v. Diecidue, 603 F.2d 535, 557 (5th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980).
 
 
 260
 The Government clearly proved that Fisher's conduct constituted a criminal attempt. Proof of an attempt charge requires a showing that the defendant "engaged in conduct which constitutes a substantial step toward commission of the crime (and a) substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent." United States v. Mandujano, 499 F.2d 370, 376 (5th Cir. 1974), cert. denied, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975); see United States v. Manley, 632 F.2d 978, 987 (2d Cir. 1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). There must be evidence that "the objective acts of the defendant evidence commitment to the criminal venture and corroborate the mens rea." United States v. Oviedo, 525 F.2d 881, 885 (5th Cir. 1976). Jiminez testified that Fisher not only attempted to receive marijuana from the PRESIDENTIAL: he actually retrieved two bales, and showed Jiminez some of the rescued marijuana.
 
 XII. RICO-RELATED CHALLENGES[97]
 
 261
 Echezarreta, Fisher and Platshorn attack their RICO convictions. Echezarreta contends that the evidence was insufficient to sustain his conviction on the RICO conspiracy count. Echezarreta also claims that his RICO conspiracy conviction must be vacated because the two counts listed as the predicate acts of racketeering activity did not satisfy the requirements of RICO. Fisher urges that his RICO substantive and conspiracy convictions must be reversed on the basis that he did not engage in a "pattern of racketeering" because the two predicate acts of racketeering activity (counts 14 and 15) both arose out of the same transaction-the PRESIDENTIAL incident. The crux of Fisher's contention is that a RICO pattern of racketeering cannot be discerned from a single "transaction" even though multiple criminal offenses arise therefrom.
 
 A. Echezarreta
 
 262
 Echezarreta was convicted of two violations of 21 U.S.C.A. § 841(a) for possession with intent to distribute and actual distribution of the same 200 pound load of marijuana; he was also convicted for one violation of 18 U.S.C.A. § 1962(a) for engaging in a pattern of racketeering and for one violation of 18 U.S.C.A. § 1962(d) for conspiring to engage in a pattern of racketeering. After trial, the district court, relying on United States v. Hernandez, 591 F.2d 1019 (5th Cir. 1979) (en banc), ruled that possession with intent to distribute and actual distribution of the same marijuana were but one criminal act. Since under 18 U.S.C.A. § 1961(5) a pattern of racketeering requires at least two criminal acts and since in Echezarreta's case the only acts of racketeering that might have occurred were the violations of Section 841(a) that the district court had found to be one offense, the district court dismissed the conviction for a substantive violation of RICO. The district court did not discuss or explain why it did not dismiss the conviction for conspiring to engage in a pattern of racketeering. We do not believe under these facts the conspiracy conviction of Echezarreta can be upheld.
 
 
 263
 The standard for proving the existence of a conspiracy in violation of 18 U.S.C.A. § 1962(d), announced in United States v. Elliott, 571 F.2d 880, 903 (5th Cir.), cert. denied sub nom. Hawkins v. United States, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), is that "an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes" (emphasis in original). As the quotation indicates, and as this Court stated in United States v. Sutherland, 656 F.2d 1181, 1187 n.4 (5th Cir. 1981), no actual acts of racketeering need occur; there need only exist a conspiracy to perform the necessary acts plus some overt action by one of the conspirators in furtherance of the conspiracy.
 
 
 264
 We have repeatedly stated that the predicate acts necessary for finding a pattern of racketeering must be two separate crimes. See, e. g., Elliott, supra; United States v. Welch, 656 F.2d 1039, 1057 (5th Cir. 1981). These crimes need not, however, be in the context of independent schemes or objectives. The discussion of the Seventh Circuit in United States v. Starnes, 644 F.2d 673, 677-78 (1981), Supreme Court appeal pending, illuminates the nature of the acts that are the necessary predicates for finding the existence of a RICO conspiracy. Defendants charged that there was only one predicate act because there was only one incident of arson involved. The court rejected that argument. Rather, it held that the acts of racketeering punishable under RICO included not only the arson punishable under state law, but also the violations of federal mail fraud laws and federal laws prohibiting interstate travel with intent to commit arson that occurred in furthering the single act of arson.
 
 
 265
 Holding similarly to Starnes is another Seventh Circuit case, United States v. Weatherspoon, 581 F.2d 595, 601-02 (1978), a non-conspiracy RICO case in which the court declined to follow defendant's argument that there was no pattern of racketeering because she was involved in only one scheme to defraud an individual. Rather, noting that Weatherspoon had engaged in several mailings as part of her scheme to defraud and that each mailing was a separate violation of the mail fraud statute, the court held that defendant had engaged in several acts of racketeering. Again the court emphasized the separate crimes that the defendant had committed in determining whether there had been the required number of acts of racketeering.
 
 
 266
 Applying Starnes and Weatherspoon to Echezarreta's situation, we find that he could be guilty of participating in a RICO conspiracy, even though the conspiracy had the single objective of importing the 200 pound load of marijuana, so long as he committed or agreed to commit at least two separate crimes in furtherance of the conspiracy's single objective. It follows, however, that, if the district judge was correct, and we believe that he was, in finding that Hernandez holds that the crimes of possession with intent to distribute and of actual distribution were merged into one, there was no separate crime performed in furtherance of the conspiracy's objective that would constitute the necessary second act of racketeering.
 
 
 267
 In Hernandez we considered whether consecutive sentences could be imposed on an individual for possession with intent to distribute and for distribution of drugs. Both crimes are violations of 21 U.S.C.A. § 841(a). The Court held that consecutive sentences could not be imposed. The element of the Court's decision critical here is whether the holding merely means that sentencing for the two convictions is merged or whether the two separate offenses merge into one. The intent of the Court is not altogether clear, but the clearest statement in the opinion is that "(w)hen the intent to distribute was executed by a successful sale, the possession with intent to do so merged into the completed offense", 591 F.2d at 1022, indicating that the Court believed the actual crimes merged into one. This conclusion concerning the Court's intent is bolstered by the Court's emphasis of Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), in which the Supreme Court, striking down the imposition of consecutive sentences for violations of the Mann Act in the transportation of two women across state lines at one time, found the act ambiguous concerning whether the actions at issue were one or two crimes and adopted a "rule of lenity" providing that "doubt will be resolved against turning a single transaction into multiple offenses." 349 U.S. at 84.
 
 
 268
 The predominant emphasis in Hernandez is on merger of offenses. We recognized this in United States v. Colmenares-Hernandez, 659 F.2d 39, 43 (1981), and United States v. Caston, 615 F.2d 1111, 1117 (1980), cert. denied, 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1981).
 
 
 269
 In summary, unless there occurred two separate acts which Echezarreta agreed to do in furtherance of the conspiracy to import marijuana, there was no pattern of racketeering necessary for conviction for participation in a RICO conspiracy. There were no two separate acts.
 
 B. Fisher
 
 270
 Fisher's contention, as stated earlier, is that because the two predicate acts underlying his RICO conviction arose from a single criminal "transaction"-the PRESIDENTIAL mission-there was no showing of a pattern of racketeering activity. The two predicate acts at issue here are the aiding and abetting the attempted importation offense, and the travel in foreign commerce in aid of racketeering offense. As we stated in our discussion of Starnes and Weatherspoon in the context of Echezarreta's claims, a transaction standard such as that proposed by Fisher is inappropriate for determining whether there occurred the requisite number of predicate acts. We decline to adopt such a standard.
 
 C. Platshorn
 
 271
 Platshorn claims that marijuana offenses are not within the ambit of RICO because marijuana is not a narcotic or dangerous drug. However, marijuana has been classified as a Schedule I controlled substance. See, e. g., United States v. Erwin, 602 F.2d 1183, 1185 (5th Cir. 1979), cert. denied, 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980). Marijuana may be the subject matter of a RICO charge. See United States v. Smith, 574 F.2d 308 (5th Cir.), cert. denied, 439 U.S. 931, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978), subsequent appeal sub nom. United States v. Stratton, 649 F.2d 1066 (5th Cir. 1981).
 
 XIII. EFFECTIVE ASSISTANCE OF COUNSEL
 
 272
 Platshorn urges on several grounds that he was denied effective assistance of counsel by his personally selected and employed trial attorney, Mr. Stream. First, he contends that Stream was absent from trial and post-trial proceedings on several days without his prior consent. Second, he claims that he was deprived of his right to testify in his own behalf because Stream informed him that if he took the stand, Stream would not undertake direct examination of him. Platshorn argues, therefore, that his decision not to testify was not a voluntary waiver of his right because of Stream's representations that he would not question Platshorn on direct examination, and that no valid waiver appears in the record because the trial court failed to inquire adequately into the validity of Platshorn's purported waiver. Third, Platshorn contends that his Sixth Amendment rights were denied because of the personal conflict between himself and Stream.
 
 
 273
 Platshorn did not raise his ineffective assistance of counsel claim before the trial court until after the trial, after the jury had found him guilty and just before sentencing, when he sent a letter to the court in which he complained about Stream's absences, claimed that Stream had abandoned him, and requested substitution of counsel. Substitute counsel was appointed for sentencing. Platshorn recognizes that as a general rule claims of inadequate representation which have not been raised before the district court cannot be raised on direct appeal. United States v. Stephens, 609 F.2d 230, 234 (5th Cir. 1980); United States v. Rodriguez, 582 F.2d 1015, 1016 (5th Cir. 1978). However, where the record is sufficiently developed with respect to such a claim, this Court may determine the merits of the claim. United States v. Brown, 591 F.2d 307, 310 (5th Cir.), cert. denied, 442 U.S. 913, 99 S.Ct. 2831, 61 L.Ed.2d 280 (1979).
 
 
 274
 The trial judge brought Platshorn's letter to the attention of all counsel just before the hearing on sentencing began. Stream at that time responded, point by point, to each of the allegations raised by Platshorn. In its order appointing substitute counsel for sentencing, the trial court stated that it had
 
 
 275
 every reason to believe that Mr. Stream has given his client adequate, competent, and satisfactory legal services up to this point in this case. However at this first suggestion of a serious conflict between the personal interests of an attorney and his client, the Court has no choice but to excuse Mr. Stream from further participation in the sentencing proceedings.
 
 
 276
 Under these circumstances, we believe that the record was sufficiently developed with respect to Platshorn's claim of ineffective assistance of counsel that we can properly determine the merits of the claim on this appeal.
 
 
 277
 In order to determine whether Platshorn was denied his Sixth Amendment right to effective assistance of counsel, we must determine whether Stream was reasonably likely to render, and rendered, reasonably effective representation. United States v. Burroughs, 650 F.2d 595, 598 (5th Cir. 1981); United States v. Killian, 639 F.2d 206, 210 (5th Cir. 1981); United States v. Hughes, 635 F.2d 449, 451 (5th Cir. 1981). The constitutional right to reasonably effective counsel does not include the right to an error-free performance. United States v. Auten, 632 F.2d 478, 483 (5th Cir. 1980); United States v. Gray, 565 F.2d 881, 887 (5th Cir.), cert. denied, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978). The defendant bears the burden of proving that he was denied effective assistance of counsel. United States v. Killian, supra, 639 F.2d at 210; Marino v. United States, 600 F.2d 462, 464 (5th Cir. 1979).
 
 
 278
 In reviewing an effective assistance of counsel allegation, this Court examines the actual performance of defense counsel and does not blindly accept speculative claims, and determines on the basis of the totality of the circumstances and the entire record whether reasonably effective assistance of counsel was rendered. United States v. Gray, supra, 565 F.2d at 887. This Court has also held that when there has been an "utter perversion of the attorney-client relationship itself," the actual trial performance need not be considered. Messelt v. State of Alabama, 595 F.2d 247, 251 (5th Cir. 1979); see United States v. Starnes, 644 F.2d 673, 681 (7th Cir. 1981).
 
 
 279
 Platshorn refers to several occasions upon which Stream was absent from trial. On the first occasion, Stream was late because his wife had been taken to the hospital the previous evening. Stream contacted the trial court and advised that Meinster's counsel would represent Platshorn until he arrived. The transcript reflects that Stream arrived sometime during the day and actively participated in the balance of the day's trial proceedings.
 
 
 280
 On the second occasion, a Saturday, Platshorn agreed to be represented by a trial attorney named Kokus. Kokus had been previously asked by Meinster's counsel to represent Meinster on that day. Neither Meinster's nor Platshorn's counsel, who were from Philadelphia and New York respectively, were present on the Saturday in issue. The court, at the prosecutor's suggestion, asked Platshorn whether he waived the presence of Stream and whether he was satisfied to have Kokus represent both him and Meinster. Kokus informed the court that he and Stream had agreed earlier in the trial that he could temporarily substitute for Stream if Platshorn had no objection. The court asked Kokus if he had Platshorn's approval and Kokus responded, after conferring with Platshorn, that although Platshorn had had no conversation with Stream about substitute counsel for that day, he would consent to being represented by Kokus for the day. The prosecutor then asked Platshorn whether this was true. Platshorn responded: "I am very confused about what to do about that. I guess it would be okay." This response, Platshorn claims, negates a determination that he validly consented to Kokus' representation.
 
 
 281
 The third absence occurred after the Government had rested its case. On that occasion Meinster's counsel represented Platshorn for the day. Meinster's attorney informed the court, in open court, that Platshorn told him that he had no objection to the temporary representation.
 
 
 282
 Finally, Stream was absent during jury deliberations after making arrangements with local counsel for them to take his place. Platshorn again approved that arrangement. Stream returned to Miami when the court was convened for the purpose of considering the issue of the impaneling of the alternate juror. Stream was also absent from all post-trial motions.
 
 
 283
 Platshorn maintains that his Sixth Amendment right was violated because he did not waive his right to be represented at trial by counsel. He asserts that he should have been asked whether he wished to proceed only after being informed of two options: (1) he could object and the trial would be halted, or (2) he could agree to proceed while represented by Meinster's counsel, provided that he was advised of the possible conflict of interest inherent in the resultant multiple representation.
 
 
 284
 Although arguably the trial court should have made further inquiry into whether Platshorn knowingly and voluntarily waived his right to be represented by his retained counsel, we discern no deprivation of Platshorn's Sixth Amendment right under the circumstances. On each of the occasions on which Stream was absent from trial, Platshorn was temporarily represented by other counsel. On the last two occasions Platshorn expressly consented to be represented for the day by the substitute counsel.
 
 
 285
 Platshorn also complains that when he told Stream that he intended to take the stand in his own behalf, Stream told him that he would not examine him on direct and that he would have to testify in a narrative manner. Platshorn contends that this constituted a coercive deprivation of his right to testify. However, when Stream informed the trial court that Platshorn no longer planned to testify, the court asked Platshorn whether he agreed with that statement and Platshorn responded affirmatively.
 
 
 286
 Platshorn relies on the dissenting opinion in Wright v. Estelle, 572 F.2d 1071, 1074 (5th Cir. 1977) (en banc), adhering to panel opinion, 549 F.2d 271, cert. denied, 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978). The dissenting opinion stated that an attorney may not use the threat of abandonment of his client in order to coerce him into not testifying in his own behalf, citing United States ex rel. Wilcox v. Johnson, 555 F.2d 115 (3d Cir. 1977). The panel opinion however, held that even if a defendant was deprived of his right to testify-the panel stated that it assumed arguendo that there exists such a fundamental right-such deprivation may be error that is harmless beyond a reasonable doubt. The Wright panel held that any such error in that case was harmless beyond a reasonable doubt because the defendant's testimony would not have altered the verdict because the evidence supporting his conviction was overwhelming. 549 F.2d at 974.
 
 
 287
 In the present case, even if we assume that Platshorn did not waive his right to testify when he stated to the trial court that he no longer planned to take the stand, we conclude that the deprivation of Platshorn's right to testify in his own behalf was error that was harmless beyond a reasonable doubt. We conclude that Platshorn's testimony would not have changed the guilty verdict because the evidence of Platshorn's guilt was overwhelming.
 
 
 288
 Finally, Platshorn claims that Stream's representation, taken as a whole and considered in light of the personal conflict between attorney and client, was ineffective. The conflict was allegedly manifested by several incidents. First, Stream moved to withdraw as counsel after he learned of the obstruction of justice indictment. Stream commented at that time-outside Platshorn's presence-that he could not thereafter look at Platshorn and sympathize with his case and stated that he felt "sick, sad and disgusted." Second, Stream requested that the sequestration be ended after only one day; he stated to the trial court that he wanted to meet with some of his other clients in New York, a concern that the trial court characterized as "petty."
 
 
 289
 Our careful review of the record indicates that Stream's representation of Platshorn did not fall short of minimal constitutional standards and that any deficiencies in Stream's efforts did not rise to the level of a constitutional violation. First we emphasize that Platshorn did not once complain of the services of his lawyer during the lengthy trial. Attorney Stream was a most vigorous advocate in Platshorn's behalf. He not only filed many pretrial motions, voiced numerous objections during trial, and participated very actively during the trial but also gave a closing argument that spans 90 pages of the transcript. In view of the totality of the circumstances and a close study of the entire record, we conclude that Stream rendered reasonably effective assistance of counsel. See United States v. Gray, supra, 565 F.2d at 887. Furthermore, there was not such "utter perversion" of the attorney-client relationship that we should decline to consider Stream's actual trial performance in its totality. See Messelt v. State of Alabama, supra, 595 F.2d at 251.
 
 XIV. CONSTITUTIONALLY EXCESSIVE SENTENCES
 
 290
 Meinster, Platshorn and Myers, relying on the proportionality analysis expressed in this Court's panel opinion in Terrebonne v. Blackburn, 624 F.2d 1363 (5th Cir. 1980), complain that their sentences were constitutionally excessive.[98] This Court, however, granted a rehearing en banc in Terrebonne, thus vacating the panel opinion. 646 F.2d 997 (5th Cir. 1981). The en banc Court held that its decision was controlled by the Supreme Court's decision in Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), which rejected the Fifth Circuit's proportionality analysis. 646 F.2d at 1001. The Supreme Court did acknowledge that a proportionality principle might be applicable in an "extreme example." 445 U.S. at 274 n.11, 100 S.Ct. at 1139 n.11.
 
 
 291
 We have reviewed appellants' sentences under the standards set forth in Rummel and the en banc Terrebonne opinion, and conclude that the sentences imposed were not constitutionally excessive.
 
 XV. PRODUCTION OF GRAND JURY MINUTES
 
 292
 Appellant Grant filed a motion for disclosure of the minutes of the grand jury that returned the original and superseding indictments in this case after he learned that a government attorney had presented to that grand jury evidence that had been earlier presented to a former grand jury. The government attorney disclosed that information to the successor grand jury without having obtained a court order, in violation of Fed.R.Crim.P. 6(e). The government attorney notified the Chief Judge of the Southern District of Florida after the disclosure had already been made, but the Chief Judge made no ruling on the propriety of such after-the-fact disclosure. Grant's motion was based on the violation of Rule 6(e) and United States v. Malatesta, 583 F.2d 748 (5th Cir. 1978), rehearing en banc, 590 F.2d 1379 (5th Cir.) (adopting panel opinion in relevant part), cert. denied, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979). He claimed that disclosure to him was necessary in order to enable him to determine whether any abuses had occurred in the manner that the material that had been presented to the first grand jury had been presented to the second grand jury that returned the indictments.
 
 
 293
 The district court denied Grant's motion to disclose the grand jury minutes after making an in camera inspection of the evidence presented to the second grand jury. The trial court's order denying Grant's motion stated that "the information presented to the second grand jury in this case reveals that the information presented was a summary of the indictment already returned by the first grand jury." The "first" grand jury, however, did not return an indictment; the successor grand jury returned two indictments-original and superseding. It is not clear from the district court's order whether its examination of the evidence presented to the "second" grand jury was limited to review of the evidence presented with respect to the issuance of the superseding indictment.
 
 
 294
 In his motion for disclosure, Grant stated that the Government had informed him that the transcripts of the testimony and evidence that had been presented to the first, non-indicting grand jury had been "reviewed" for the second, indicting grand jury.
 
 
 295
 This Court in United States v. Malatesta, supra, 583 F.2d 748, confronted a Rule 6(e) problem similar to the instant one. In that case a grand jury returned an indictment based in part upon testimony that had been given to a prior grand jury. The defendants sought dismissal of the indictment because the prosecutor disclosed the prior grand jury material to the successor grand jury without first obtaining a court order in violation of Fed.R.Crim.P. 6(e), which
 
 
 296
 prohibits disclosure of matters occurring before the grand jury except when it is directed by the court, is made to the attorneys for the government for use in the performance of their duties, or is made to government personnel deemed necessary to assist an attorney for the government in performance of his duty to enforce federal criminal law.
 
 
 297
 Id. at 752.
 
 The Malatesta Court recognized that
 
 298
 (t)he real problem in later disclosure to another grand jury may lie in possible prosecutorial abuse, such as the use of selected portions of the testimony, or the presentation of a transcript when the witness in person would be unimpressive. So long as the defendant is prevented from discharging the grand jury's minutes, Pittsburgh Plate Glass Co. v. United States, (360 U.S. 395, 79 S.Ct. 1230, 3 L.Ed.2d 1323 (1959)), and United States v. Procter & Gamble Co., (356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)), the prosecutor's actions remain virtually unchecked. Even court scrutiny after the fact may not always be effective.
 
 
 299
 Id. at 753.
 
 
 300
 The Malatesta Court held that, although a court order should have been obtained before transcripts, excerpts or summaries of testimony that were presented to a prior grand jury are disclosed to a successor grand jury, the prosecutor's failure to obtain a prior court order does not require dismissal of the indictment in the absence of any showing of abuse. Id. "Violation of Rule 6 by disclosing grand jury testimony to another grand jury does not per se invalidate an indictment." Id. at 754.
 
 
 301
 In the present case the government attorney violated Rule 6(e) by disclosing the grand jury material of a prior grand jury to the successor, indicting grand jury without obtaining a prior court order. However, this Court will dismiss the indictment only upon a showing that there was such an abuse of the grand jury process that any substantial rights of the defendant were impaired or the integrity of the grand jury proceedings was impugned. Id.
 
 
 302
 We have reviewed in camera the material that was read to the indicting grand jury by the government's attorneys. The material is a summary of the government's evidence that was to be presented to the indicting grand jury. While the summary as read reflected, at least in part, a review of some of the evidence that had been presented to a prior non-indicting grand jury, the summary was not presented for the purpose of establishing probable cause for any count in the indictment returned. It is obvious that the summary was read for the purpose of giving the members of the indicting grand jury an overview of the Black Tuna group's extensive operations so as to enable the members of the indicting grand jury to more readily follow the evidence as it unfolded through the testimony of the many witnesses that appeared and testified before the indicting grand jury. While such a procedure may have constituted a technical violation of Rule 6(e), since it occurred prior to obtaining a court order, dismissal of the indictment was not required since there was no abuse of the grand jury process and no substantial rights of the defendants were infringed. United States v. Malatesta, supra, 583 F.2d at 754.
 
 
 303
 We have also reviewed the testimony presented by the numerous witnesses who appeared before the indicting grand jury. Our examination of the testimony reveals that independent of the improperly disclosed material there was sufficient evidence before the indicting grand jury from which it could find probable cause for each of the counts returned against each of the appellants.
 
 CONCLUSION
 
 304
 As all experienced trial and appellate judges know, it is virtually impossible to conduct a trial free of some technical errors. This is particularly true in lengthy trials involving multiple defendants and attorneys, and numerous complex substantive and procedural problems. However, a defendant is entitled only to a fair trial, not a perfect one. Lutwak v. United States, 344 U.S. 604, 619-20, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953); United States v. Evans, 572 F.2d 455, 491 (5th Cir.), cert. denied, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978). We are convinced after careful and exhaustive review of the record that each of the defendants received a fair trial.
 
 
 305
 The convictions and sentences imposed on appellants MEINSTER, PLATSHORN, MYERS, FISHER, and GRANT are AFFIRMED.
 
 
 306
 The convictions of ECHEZARRETA are AFFIRMED except for Count 2.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 **
 District Judge of the Middle District of Florida, sitting by designation
 
 
 [1]
 Of the six other defendants named in the indictment, two (Carl London and Mark Phillips) were tried jointly with appellants but absconded during the trial and have not yet been recaptured. One other, Raul Davila, resides in Colombia and has never been tried. Charges were dismissed against Ronald Elliott. Lynne Platshorn, the wife of appellant Platshorn, entered a plea of guilty to one count. Gregory Poulos was tried subsequently to appellants and acquitted on the three counts charged against him
 In No. 79-3189 defendant Phillips is listed as an appellant. Although convicted, Phillips has not been sentenced. In light of Phillips' fugitive status, we dismiss his appeal. See Molinaro v. New Jersey, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970); United States v. Wood, 550 F.2d 435, 437-38 (9th Cir. 1976); United States v. Isuman, 482 F.2d 1378 (5th Cir. 1973).
 
 
 [2]
 The sentences imposed by the district court in the aggregate were as follows: MEINSTER-imprisonment for 53 years, fines of $270,000, special parole terms totalling 6 years; PLATSHORN-imprisonment for 64 years, fines of $325,000, special parole terms totalling 8 years; MYERS-imprisonment for 33 years, fines of $100,000, special parole terms totalling 4 years; FISHER-imprisonment for 9 years, $15,000 fine, special parole terms totalling 2 years; ECHEZARRETA-imprisonment for 4 years, $10,000 fine, special parole term of 2 years. Three appellants' sentences included a number of years imposed for their continuing criminal enterprise convictions: Meinster, 31 years; Platshorn, 34 years; and Myers, 22 years. A sentence imposed for a continuing criminal enterprise conviction is not subject to parole. 21 U.S.C.A. § 848(c)
 
 
 [3]
 We note that each appellant has adopted arguments raised by other appellants
 
 
 [4]
 The magnitude of the effort required by this Court for careful review of appellants' contentions is reflected both by the size of the record-more than 80 volumes containing some 12,000 pages of trial transcript and some 3,000 pages in the volumes of pleadings-and by the length of the appellate briefs. Appellants' briefs totalled nearly 350 pages, and with only a few exceptions appellants did not duplicate arguments made by other appellants
 
 
 [5]
 An extensive discussion of the facts concerning the Black Tuna organization's large-scale importation and distribution efforts is included in the Government's brief. Appellants declined to discuss in any depth in their briefs the scope of their illegal enterprise. Only one appellant, Myers, filed a reply brief and we have taken note of Myers' challenges to the accuracy of certain of the Government's statements of facts
 
 
 [6]
 The trip by Platshorn was not uneventful; he told Jiminez that he was arrested and held captive by the military in Colombia until Davila made a $300,000 payment. On at least two other occasions Black Tuna pilots were arrested by the army in Colombia and ransomed by Davila
 
 
 [7]
 Purvis was a government witness at trial. He was also a government witness at a previous trial of Platshorn and Meinster on importation charges arising from the OSSPREY incident in North Carolina. United States v. Meinster, 619 F.2d 1041 (4th Cir. 1980). One of the counts in the indictment in the present case charged that Grant threatened to murder Purvis, but a judgment of acquittal was granted on that count
 
 
 [8]
 For a full discussion of the OSSPREY incident, see United States v. Meinster, supra, 619 F.2d at 1042-43
 
 
 [9]
 For the district court's order on replacement of the juror see United States v. Meinster, 484 F.Supp. 442 (S.D.Fla.1980)
 
 
 [10]
 The trial began with four alternates; three were substituted for regular jurors prior to the conclusion of the parties' presentation of their cases
 
 
 [11]
 The court did learn from the confiscation of the materials given to the jurors that they had not written on the verdict forms
 
 
 [12]
 THE COURT:
 Now, as I informed you individually, in my discussions with you, from my questions, you know that it is your duty and responsibility to now start your discussions fresh, just as you did on the first day that you commenced your discussions.
 You will have to start over again as though you have never discussed the case and start fresh, because Mr. Lewis will have to hear your discussions and participate fully in your discussions just as if he had been a full juror from the day that you first went out.
 So, I am instructing you to do that, to set aside all past deliberations and disregard those deliberations.
 The reason for this is that the Government and the Defendants in this case, have the right to verdicts which were reached only after a full participation of all jurors who ultimately return those verdicts.
 This right can only be assured if you begin your deliberations afresh.
 Each of you must disregard the initial deliberations, discussions and votes, if any, as if they never occurred.
 Without indicating that you have or have not reached any tentative verdicts, because I do not know, although I gather from (the foreman's) statement that you may not have actually reached a formal verdict, but without indicating that, or any opinions, during your initial deliberations on the evidence in the case, I direct you to wipe your minds clean of such tentative verdicts, decisions or opinions.
 You have each said that you could do so, and I am now instructing you that it is your duty to do so.
 The court then reinstructed the jury on its duty to reach a unanimous verdict representing the collective and considered judgment of each juror, and on each juror's duty to consult and deliberate with all other jurors.
 
 
 [13]
 The trial court in this case followed the substitution procedure used six months earlier by the trial court in United States v. Barone, 83 F.R.D. 565, 568 (S.D.Fla.1979), appeal docketed, No. 80-5025 (5th Cir. January 23, 1980). In Barone, a complex organized crime case, the court was confronted after a six-month trial with the problem of a juror who became incapacitated after several days of deliberations. An alternate juror was substituted after the court determined that no prejudice would result. The court stressed that Barone was a case that justified an innovative procedure which could secure a just and non-prejudicial result
 The defendants in Barone unanimously objected both to the court's failure to discharge the two remaining alternates and to the substitution of the alternate. After the jury retired, the court sequestered the two alternates for two days in a hotel. Then, the alternates were discharged to their homes but were advised that they might be recalled. They were also instructed to avoid media coverage and to avoid discussing the case. Before the alternate was substituted she assured the court that she had not been exposed to media or conversation regarding the case and that she could continue to give all parties a fair trial. The remaining jurors were questioned individually by the court concerning "whether they could begin deliberations anew, and whether, if they had either personally or collectively arrived at opinions or conclusions, they could erase these from their thoughts" and give full consideration to all subsequent deliberations. Id. at 567. The jurors gave their assurances, were reinstructed, and then returned to deliberate.
 
 
 [14]
 Appellants also claim that the trial court's substitution of the alternate after deliberations had begun violated due process and the prohibition against double jeopardy. Appellants do not develop their due process argument and, for the purpose of this issue, we do not find appellants' general "violation of due process" assertion to be distinguishable from their Sixth Amendment argument
 As support for their double jeopardy assertion, appellants rely on dictum in United States v. Hayutin, 398 F.2d 944 (2d Cir.), cert. denied, 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968), subsequent appeal sub nom. United States v. Nash, 414 F.2d 234 (2d Cir.), cert. denied, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969). That court stated that the danger or prejudice from substitution of an alternate juror after deliberations have begun
 flows from the fact that a defendant runs the risk of being tried by more than twelve jurors guaranteed to him by the Constitution and the Rule, or of being placed in double jeopardy by being tried by more than one jury (Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854).
 398 F.2d at 950.
 We do not find appellants' double jeopardy assertion persuasive. Consideration of defendant's case by a jury which includes a former alternate who has replaced a regular juror after deliberations have begun no more violates the double jeopardy clause than does consideration by a jury which includes a former alternate who has replaced a regular juror during the trial before jury deliberations have begun. In neither situation has the defendant been tried by more than one jury.
 
 
 [15]
 The New York Court of Appeals in People v. Ryan recognized the danger that a newly impaneled juror would confront eleven other jurors who had already reached conclusions about the case:
 "the alternate juror entered the jury room after the eleven original jurors had sifted the evidence, and in all probability, already formulated their preliminary positions. Most important of all, each of the eleven jurors was aware of the outlooks and positions of the others on the questions presented by the case, and sufficient time had elapsed so that surely the interplay of influences among and between the jurors had come into operation. * * *
 (I)f deliberations had progressed to a stage where the original eleven were in substantial agreement, they were in a position to present a formidable obstacle to the alternate juror's attempts to persuade and convince the eleven remaining original jurors."
 
 
 [19]
 N.Y.2d at 103, 224 N.E.2d at 712, 278 N.Y.S.2d at 201 (quoting the defendants' brief)
 
 
 [16]
 In Evans the trial court replaced a regular juror with an alternate after the jury had begun deliberations; however, the defendant expressed himself unequivocally in favor of proceeding with the newly constituted jury. The newly constituted jury was not specifically instructed to begin its deliberations anew, but rather was told only to continue its deliberations. Nevertheless, the appellate court concluded that the "speculative assertion of prejudice ..., to which no objection was raised, was insufficient to justify reversal," stating that "(n)othing precluded the jury from starting from the very beginning all over again." 635 F.2d at 1128 (emphasis added)
 
 
 [17]
 The California Supreme Court in People v. Collins noted that, although the question in that case was controlled by the state constitution, the result reached satisfied minimum federal constitutional standards. 131 Cal.Rptr. at 785 n.3, 552 P.2d at 745 n.3. The court discussed in depth the defendant's right to trial by jury in the context of substitution of alternates. The court stated that the essential elements of that right included the requirement that the jury consist of twelve persons and that it reach a unanimous verdict. Those elements were viewed by the court as constituent parts of a broader right requiring that each of the twelve jurors engage in all of that jury's deliberations. The court stated:
 The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11.... The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity.
 Id. 131 Cal.Rptr. at 786, 552 P.2d at 746. The court concluded that a defendant's fundamental right to a unanimous verdict by a twelve-person jury is not violated where the jury is instructed to begin anew with its entire process of deliberation and where the substituted alternate juror participates fully in those deliberations.
 
 
 [18]
 The United States Supreme Court recently denied certiorari in a case in which a defendant challenged his conviction in a California state court on the grounds that substitution of two alternate jurors after deliberations had begun deprived him of due process under the Fourteenth Amendment. People v. Skelton, 109 Cal.App.3d 691, 167 Cal.Rptr. 636, cert. denied, 450 U.S. 917, 101 S.Ct. 1361, 67 L.Ed.2d 343 (1981)
 
 
 [19]
 Other circuits have held that permitting an alternate to remain with the jury during deliberations is reversible error. United States v. Chatman, 584 F.2d 1358, 1361 (4th Cir. 1978); United States v. Beasley, 464 F.2d 468 (10th Cir. 1972); United States v. Virginia Erection Corp., 335 F.2d 868 (4th Cir. 1964). See 2 C. Wright, Federal Practice & Procedure § 388 at 52 (1969)
 
 
 [20]
 The dissent in Lamb stated that it is unclear upon which factors the majority opinion rests and characterized the majority opinion as ambiguous. 529 F.2d at 1158, 1160 & n.3
 
 
 [21]
 We disagree with the Ninth Circuit's view that substitution of an alternate juror after deliberations have begun is so inherently coercive that a per se reversal rule is warranted. See United States v. Lamb, supra, 529 F.2d at 1156
 
 
 [22]
 Additionally, as in United States v. Capo, supra, 595 F.2d at 1093, the court below instructed the jury in the final charge to base its verdict solely upon the evidence without prejudice or sympathy
 
 
 [23]
 See United States v. Crowell, 586 F.2d 1020, 1024 (4th Cir. 1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979), in which the court held that even though during the fourth day of trial a newspaper ran a banner headline story about a threat to kill the defendant, the denial of the jurors, in response to collective inquiry, that they were aware of the prejudicial publicity was sufficient and the trial judge was not required to proceed further
 
 
 [24]
 The trial court denied appellants' request at the beginning of the trial that the jury be sequestered. A trial court's decision not to sequester the jury is a matter within its sound discretion and will not constitute reversible error where the defendants made no showing that they were actually prejudiced by publicity concerning the trial and the jury had been admonished to avoid exposure to news media reports concerning the trial. United States v. Ricardo, 619 F.2d 1124, 1131-32 (5th Cir. 1980), cert. denied, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980)
 
 
 [25]
 The government attorney in charge of the Organized Crime Strike Force that conducted the obstruction of justice investigation assured the trial court that the government had no evidence that any other jurors had been contacted in any manner by anyone. For some indication of the extent of the government's investigation, see United States v. Meinster, 481 F.Supp. 1117 (S.D.Fla.1979)
 
 
 [26]
 The Forrest Court noted that whether the comments are favorable or unfavorable to the defendant is immaterial and stated that even a passing reference to the merits of the case or to the tampering would have carried the potential for prejudice. 620 F.2d at 457. The district court in the present case, in response to a defense motion for a mistrial based on a suspected contaminated jury, asked Meinster's counsel in a speculative manner whether, if the bribed juror had spoken favorably about the defendants, Meinster would have standing to argue the removal of those other jurors. The Forrest Court has provided the answer to that question. The court below did not, however, rule that Meinster lacked standing to argue for the removal of any jurors who might have spoken to the bribed juror
 
 
 [27]
 The Supreme Court in Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), held that
 "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is ... presumptively prejudicial .... The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."
 In Remmer the Court first remanded for a full hearing by the district court to determine whether a third-party's suggestion to a juror that he could profit by dealing with the defendant was harmful to the defendant. 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654. The defendant was unaware until after his first trial of the outside contact with the juror although the trial court was aware of the contact, having been informed by the juror. On appeal after remand, the Court again remanded to the district court, this time for a new trial, because the district court's hearing had inadequately inquired into the third-party contact with the juror. Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956).
 
 
 [28]
 See the discussion of the Herring-Capo test in part III A of this opinion, supra at p. 997
 
 
 [29]
 See United States v. Meinster, 478 F.Supp. 1131 (S.D.Fla.1979), 488 F.Supp. 1342, 1347 (S.D.Fla.1980)
 
 
 [30]
 Attorneys from the Organized Crime Strike Force received permission from Chief Judge Atkins of the Southern District of Florida before informing Judge King of the plans of certain defendants to disrupt the trial. United States v. Meinster, 488 F.Supp. at 1349. Judge King determined that the activities of the Strike Force attorneys investigating the obstruction of justice episodes were entirely distinct from the prosecution team in the Black Tuna drug trial. Id. at 1347; United States v. Meinster, supra, 478 F.Supp. at 1133
 
 
 [31]
 Appellants claim that the trial judge was "effectively conditioned by the Government to assume the worst about the defendants from all of these meetings, as evidenced by his ordering for the first time during his judicial tenure, electronic security screening of all visitors except government personnel." Appellants' complaints that the trial judge overreacted in ordering that the courtroom be protected by security devices are without merit. See, e. g., United States v. Barnes, 604 F.2d 121, 134 n.3 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980) (citing cases in which intensified security measures were implemented as a result of attempts to influence, intimidate or threaten witnesses or jurors in narcotics cases)
 
 
 [32]
 See United States v. Meinster, 481 F.Supp. 1119 (S.D.Fla.1979)
 
 
 [33]
 At one point in the hearing an FBI agent testified about conversations which occurred in meetings between a government operative and certain defendants:
 THE WITNESS: Well, sir, during the meetings that I am aware of and had recordings of, they were talking about tampering with the witnesses, disrupting the trial through intimidating the witnesses, and involuntary removal of the judge, and paying jurors.
 THE COURT: Those are kind of interesting words. What does "involuntary removal of the judge" mean?
 THE WITNESS: I took it to mean killing the judge, sir.
 MR. SHERES: I request that be stricken.
 THE COURT: Denied.
 
 
 [34]
 United States v. Meinster, supra, 488 F.Supp. at 1349-50
 
 
 [35]
 28 U.S.C.A. § 144 provides in pertinent part:
 Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
 28 U.S.C.A. § 455 provides in pertinent part:
 (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 (b) He shall also disqualify himself in the following circumstances:
 (1) Where he has a personal bias or prejudice concerning a party ....
 
 
 [36]
 This Court in Phillips v. Joint Legislative Committee, 637 F.2d 1014 (5th Cir. 1981), noted that, to the extent the two statutes differ, Section 455 imposes a stricter standard: under Section 455 the movant must demonstrate that a reasonable person "would harbor doubts about the judge's impartiality," whereas under Section 144 the movant must allege facts sufficient to convince a reasonable person that bias exists. Id. at 1019 n.6, quoting Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1111 (5th Cir.), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). A second difference is that Section 455, unlike Section 144, does not stipulate a formal procedure by which claims arising under it must be raised. Section 144 provides that a party must file an affidavit. The judge passes on the legal sufficiency of the affidavit, taking the allegations of the affidavit as true for the purposes of recusal. Phillips, supra, 637 F.2d at 1019. An affidavit is legally sufficient if it meets a three-part test: "1. The facts must be material and stated with particularity. 2. The facts must be such that, if true, they would convince a reasonable person that bias exists. 3. The facts must show the bias is personal, as opposed to judicial in nature." Id., quoting Parrish v. Board of Comm'rs, 524 F.2d 98, 100 (5th Cir. 1975) (en banc), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). Although Sections 144 and 455 may each be raised by motion, Section 455 requires no motion; a judge is required to disqualify himself if the facts cast doubt on his impartiality. Phillips, supra, 637 F.2d at 1019-20 & n.6
 
 
 [37]
 Phillips v. Joint Legislative Committee, supra, 637 F.2d at 1020; In re Corrugated Container Antitrust Litigation, supra, 614 F.2d at 964-65; United States v. Serrano, 607 F.2d 1145, 1150 (5th Cir. 1979), cert. denied, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980)
 
 
 [38]
 See Berger v. United States, 255 U.S. 22, 31, 41 S.Ct. 230, 65 L.Ed.2d 481 (1921); Phillips v. Joint Legislative Committee, supra, 637 F.2d at 1020; In re Corrugated Container Antitrust Litigation, supra, 614 F.2d at 964; United States v. Serrano, supra, 607 F.2d at 1150; United States v. Clark, 605 F.2d 939, 942 (5th Cir. 1979); United States v. Bobo, 586 F.2d 355, 366 (5th Cir. 1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979); United States v. Archbold-Newball, 554 F.2d 665, 682 (5th Cir.), cert. denied, 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977); Davis v. Board of School Comm'rs, supra, 517 F.2d at 1051
 
 
 [39]
 In re Corrugated Container Antitrust Litigation, supra, 614 F.2d at 964-66; United States v. Clark, supra, 605 F.2d at 942; United States v. Bobo, supra, 586 F.2d at 366; United States v. Archbold-Newball, supra, 554 F.2d at 682; United States v. Partin, 552 F.2d 621, 636, 639 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977)
 
 
 [40]
 See Phillips v. Joint Legislative Committee, supra, 637 F.2d at 1020 n.7; Whitehurst v. Wright, 592 F.2d 834, 838 (5th Cir. 1979)
 
 
 [41]
 United States v. Meinster, supra, 488 F.Supp. at 1349-50. The Strike Force attorneys sought the court's consent for the consensual surreptitious tape recordings that would be made by the government's confidential informant and, although the court stated that it was unsure that its consent was necessary, it further stated that so far as it was concerned the government could continue its investigation. Id
 
 
 [42]
 Three of the comments cited by appellants were made by the court just after the obstruction of justice indictments were returned, when the court advised the attorneys that Saturday trial sessions would be held. The court first stated:
 THE COURT: (T)he headline is something to the effect that a Black Tuna juror is removed .... (The jury will) have to be sequestered, unless you have no objection to them learning of the events taking place, and I'm sure you would object .... There is another factor, too, because of the activity of your client and because of the activity of others, there are problems that I have that keep me a virtual prisoner.
 The court further observed, in response to one defense attorney:
 THE COURT: You have no consideration for me and no understanding for me.
 The court then expressed sympathy for out-of-town defense counsel:
 THE COURT: Mr. Cogan, I understand your situation, but I really am probably the only one in the court that has sympathy for your personal problems, or Mr. Stream's.
 Obviously, the two of you do not have any understanding or sympathy of my problem.
 Would you like to explain to my wife some of the tape-recording conversations that were heard last evening and the inferences and testimony that came out in court? Do you think your wife would be hysterical if she thought your life was in jeopardy?
 That is difficult to explain.
 Earlier, after the obstruction of justice indictments were returned, the court stated:
 The American people have every right to expect and indeed the Constitution guarantees that every court proceeding in the United States District Courts of this country be conducted honestly, fairly and impartially.
 The evidence that I have heard during (these) proceedings clearly convinces me that defendants in this trial have done all in their power to disrupt these proceedings and to destroy the integrity of this jury and the entire proceedings.
 They have exhibited nothing but contempt for the whole process in spite of every effort on the part of at least this judge to ensure that they each and every one receive a fair trial.
 
 
 [43]
 See United States v. Meinster, 481 F.Supp. at 1125-32. However, some of that information received by the court under oath later proved to have arisen from an unreliable source
 
 
 [44]
 See United States v. Meinster, 475 F.Supp. 1093 (S.D.Fla.1979), for the district court's order denying the motions to dismiss the indictment on double jeopardy grounds
 
 
 [45]
 It appears that the reason for the separate trials was the lack of cooperation between the North Carolina prosecutors and the Justice Department attorneys handling the Florida prosecution
 
 
 [46]
 Meinster and Platshorn were initially charged in the North Carolina case with conspiracy to import marijuana in violation of 21 U.S.C.A. § 846. The North Carolina prosecutor dismissed the conspiracy count at the direction of the Justice Department attorneys prosecuting the Florida case because prosecution of that conspiracy count would have precluded on double jeopardy grounds a subsequent continuing criminal enterprise count in Florida. Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977)
 
 
 [47]
 Platshorn adopts the double jeopardy argument of Meinster
 
 
 [48]
 However, the Blockburger test, in a case involving successive prosecutions, is not the only test; successive prosecutions may be barred when the later prosecution requires relitigation of factual issues resolved by the earlier prosecution. Brown v. Ohio, supra, 432 U.S. at 166-67 n.6, 97 S.Ct. at 2225-26 n.6, citing Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); and In re Nielson, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889)
 
 
 [49]
 See United States v. Tercero, 580 F.2d 312, 315 (8th Cir. 1978) (in criminal conspiracy case, test is whether the totality of the circumstances demonstrates that two alleged conspiracies are actually part of a single conspiracy); accord, United States v. Jabara, 644 F.2d 574, 577 (6th Cir. 1981)
 
 
 [50]
 Whether events charged in two indictments were part of a single agreement depends upon the following factors:
 (1) time, (2) persons acting as coconspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.
 United States v. Marable, supra, 578 F.2d at 154, quoted in United States v. Futch, 637 F.2d 386, 389 (5th Cir. 1981), and United States v. Stricklin, 591 F.2d 1112, 1122 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979).
 
 
 [51]
 The Supreme Court in Albernaz noted that a single continuing agreement, no matter how diverse its objects, may not give rise to multiple prosecutions where such an agreement violates but a single statute, citing Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), 101 S.Ct. at 1142-43
 
 
 [52]
 The Supreme Court affirmed this Circuit's en banc decision in United States v. Rodriguez, 612 F.2d 906 (5th Cir. 1980), in which the holding was limited to the context of a single trial. Id. at 920-24
 
 
 [53]
 The Smith Court has been criticized for "rigidly applying the 'same evidence' test." Tarlow, RICO: The New Darling of the Prosecutor's Nursery, 49 Fordham L.Rev. 165, 261 (1980)
 
 
 [54]
 The defendant had been convicted under § 848 in a Texas prosecution for offenses that occurred in Texas in 1974 and from December 1976 to 1978. The Massachusetts indictment charged offenses committed in Massachusetts in 1975; importing and possessing marijuana, and conspiring to import and to distribute marijuana. The persons implicated in the Texas and Massachusetts indictments were different and the charges in the separate indictments did not grow out of "a single criminal act, occurrence, episode or transaction." 653 F.2d at 29. Furthermore, the evidence used with respect to the separate indictments was different
 
 
 [55]
 Meinster claims that the government may not conduct "multiple prosecutions" of RICO predicate offenses and later use those convictions to prove a RICO offense. This contention misunderstands the nature of RICO. The legislative history of RICO demonstrates that Congress intended to permit the imposition of cumulative sentences for both RICO offenses and the underlying predicate offenses. United States v. Hawkins, 658 F.2d 279 (5th Cir. 1981); United States v. Boylan, 620 F.2d 359 (2d Cir. 1980), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1981). Thus, a defendant may be convicted for the predicate acts which form the basis for the RICO charge and later charged under RICO. United States v. Anderson, 626 F.2d 1358, 1367 (8th Cir. 1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981); United States v. Aleman, 609 F.2d 298, 306 (7th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); United States v. Solano, supra, 605 F.2d at 1143. A conviction under RICO does not, therefore, grant immunity for the offenses charged as the predicate acts of racketeering activity. See United States v. Boylan, supra, 620 F.2d at 361; United States v. Rone, 598 F.2d 564, 572 (9th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980)
 
 
 [56]
 See also United States v. Brooklier, 637 F.2d 620 (9th Cir. 1980), in which the government initially prosecuted the defendants on a RICO conspiracy charge, listing as a predicate act of racketeering activity conspiracy to extort from a particular bookie, and listing as overt acts in furtherance of the RICO conspiracy several acts resulting in the single incident of actual extortion from the bookie. Four years later the defendants were prosecuted for a substantive RICO violation; one of the acts of racketeering activity listed was actual extortion from the bookie. The court held that the double jeopardy clause did not bar the successive prosecutions because the Blockburger test would have permitted simultaneous prosecution of the defendants for violating RICO by conspiring to extort and for violating RICO by actually committing the extortion
 
 
 [57]
 18 U.S.C.A. § 2 provides in pertinent part:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.
 
 
 [58]
 The First Circuit in United States v. Turkette, 632 F.2d 896, 902-03 (1st Cir. 1980), rev'd, --- U.S. ----, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), found the converse of Meinster's argument to be troublesome. The court reasoned that if a RICO "enterprise" is construed to include illegitimate organizations (as the Supreme Court held in reversing the court), the § 848 offense of engaging in a continuing criminal enterprise is thereby swallowed. The difficulty with the First Circuit's reasoning is that "racketeering activity in the abstract does not necessarily involve a drug related activity." United States v. Solano, supra, 605 F.2d at 1145, citing this Court's opinion in United States v. Smith, supra, 574 F.2d at 310-11. Section 848 requires proof of a continuing series of federal narcotics violations, while a RICO violation may be shown by proof of predicate acts of racketeering which, as provided in 18 U.S.C.A. § 1961, may be prior state convictions for certain designated crimes, certain federal offenses under Title 18, United States Code, or any federal dangerous drug or narcotic offense
 
 
 [59]
 RICO, the Racketeering Influenced and Corrupt Organization Act of 1970, 18 U.S.C.A. §§ 1961-1968, provides in pertinent part:
 § 1961
 As used in this chapter-
 (1) "racketeering activity" means
 (B) any act which is indictable under any of the following provisions of Title 18, United States Code: ... section 1952 (relating to racketeering) ..., or (D) any offense involving ... the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs punishable under any law of the United States;
 (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
 (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;
 § 1962
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ....
 (d) it shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 
 
 [60]
 The Supreme Court's decision in Turkette disposes of appellants' contention that because their enterprise was alleged to be engaged in wholly illegal activities, a RICO prosecution was barred
 
 
 [61]
 21 U.S.C.A. § 848 provides in pertinent part:
 (a)(1) Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2); except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine of not more than $200,000, and to the forfeiture prescribed in paragraph (2).
 (2) Any person who is convicted under paragraph (1) of engaging in a continuing criminal enterprise shall forfeit to the United States-
 (A) the profits obtained by him in such enterprise, and
 (B) any of his interest in, claim against, or property or contractual rights of any kind affording a source of influence over, such enterprise.
 (b) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if-
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter-
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 (B) from which such person obtains substantial income or resources.
 (c) In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted, and section 4202 of Title 18 (permitting parole) shall not apply.
 
 
 [62]
 Section 848 is often referred to as the "Kingpin" statute because it is designed to apply to leaders of large-scale narcotics operations. United States v. Johnson, supra, 575 F.2d at 1358; United States v. Webster, 639 F.2d 174, 180 (4th Cir. 1981). Section 848 focuses on the organizers of narcotics operations while RICO focuses on all direct and indirect participants in the organized criminal enterprise. See United States v. Elliott, supra, 571 F.2d at 903
 
 
 [63]
 In two recent cases the defendants were charged with both substantive RICO violations and § 848 violations. United States v. Webster, 639 F.2d 174 (4th Cir. 1981); United States v. Mannino, supra, 635 F.2d 110. In Mannino the predicate acts of racketeering activity included various firearms violations in addition to the numerous narcotics violations. In Webster the predicate acts of racketeering activity included three counts of charging interstate travel in aid of unlawful activity in violation of 18 U.S.C.A. § 1952(a)(3). Those cases did not discuss the double jeopardy same offense problem with respect to § 848 and RICO
 
 
 [64]
 The Government admitted before the district court that double jeopardy considerations stemming from Grant's previous conspiracy trial precluded a new prosecution on a § 848 or RICO conspiracy charge. United States v. Meinster, 475 F.Supp. 1093, 1096 (S.D.Fla.1979). One commentator has agreed with the district court's suggestion that a prior conspiracy conviction under 21 U.S.C.A. § 846 will bar an indictment on a RICO conspiracy charge or a § 848 charge, but will not bar a substantive RICO charge. Tarlow, RICO: The New Darling of the Prosecutor's Nursery, 49 Fordham L.Rev. 165, 261 n.521 (1980). That commentator stated that the distinction between application of double jeopardy principles to § 848 and to the substantive RICO statute, 18 U.S.C.A. § 1962(c), is persuasive because § 848 is in essence a conspiracy statute unlike § 1962(c)
 
 
 [65]
 Fed.R.Crim.P. 8(b) provides in pertinent part:
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.
 
 
 [66]
 Fed.R.Crim.P. 14 provides in pertinent part:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 [67]
 In deciding whether to permit joinder of defendants under Rule 8(b), the trial court must accept the factual allegations of the indictment as true. United States v. Zicree, 605 F.2d 1381, 1387 (5th Cir. 1979), cert. denied, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); United States v. Levine, 546 F.2d 658, 663 (5th Cir. 1977)
 
 
 [68]
 Echezarreta was named in 19 of 407 overt acts listed in the RICO conspiracy count and he was named in 6 of the 36 counts of the indictment. He claims that only approximately 120 pages out of the 12,000 pages of transcript contain direct testimony of government witnesses concerning him. He insists that because the evidence concerning him could have been presented in a few days, it was improper to join him in a 41/2 month trial
 Fisher was charged in 2 counts arising out of the PRESIDENTIAL incident; those 2 counts also served as the predicate acts for his RICO charges.
 
 
 [69]
 That prosecutor also stated in his affidavit that, although he had argued for inclusion of a § 848 count against Myers in the original indictment, he had been unable to persuade his co-prosecutors to bring that charge at that time because they believed that they needed additional evidence. He further asserted that he told Myers' counsel that he personally believed that there was sufficient evidence alleged in the original indictment to charge Myers with a § 848 count
 
 
 [70]
 The Fourth Circuit recently adopted the following test for determining prosecutorial vindictiveness: "whether, in the particular factual situation presented, there existed a 'realistic likelihood of vindictiveness' for the prosecutor's augmentation of the charges." United States v. Andrews, 633 F.2d 449, 453 (4th Cir. 1980) (en banc), cert. denied, 450 U.S. 927, 101 S.Ct. 1382, 67 L.Ed.2d 358 (1981). The court further held that the Government has the burden of disproving or rebutting the realistic likelihood of vindictiveness by "objective, on-the-record explanations," such as governmental discovery of previously unknown evidence. Id. at 456 & n.10
 The rule in the Ninth Circuit is that a presumption of vindictiveness may be inferred even without evidence of an actual retaliatory motive and that such a presumption "arises when the 'totality of circumstances surrounding the prosecutorial decision at issue' suggests the 'appearance of vindictiveness.' " United States v. Robison, 644 F.2d 1270, 1272 (9th Cir. 1981), quoting United States v. Griffin, 617 F.2d 1342, 1347 (9th Cir.), cert. denied, 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980). The prosecution has the burden of rebutting the appearance of vindictiveness by demonstrating either independent reasons or intervening circumstances. Robison, 644 F.2d at 1272.
 
 
 [71]
 For a thorough discussion of Blackledge, Jackson, and Hardwick, see Miracle v. Estelle, 592 F.2d 1269 (5th Cir. 1979); see also United States v. Thomas, 593 F.2d 615, 624 (5th Cir.), modified on rehearing, 604 F.2d 450 (5th Cir. 1979), on appeal after remand, 617 F.2d 436 (5th Cir.), cert. denied, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980)
 
 
 [72]
 Moreover, at no time did the government inform Myers that he would not be prosecuted on a continuing criminal enterprise count. See United States v. Stacey, 571 F.2d 440, 444 (8th Cir. 1978)
 
 
 [73]
 See the district court's order denying Grant's motion to suppress, United States v. Grant, 476 F.Supp. 400 (S.D.Fla.1979)
 
 
 [74]
 The magistrate who held the hearing on the motion to suppress recommended that the motion be granted. The district court disagreed with the magistrate's recommendation and made a de novo determination with respect to contested findings of fact and the magistrate's conclusions of law
 
 
 [75]
 The district court also noted that Eaton acted in part in reliance on information received from a previously reliable informant. An uncorroborated tip from a previously reliable informant may justify a forcible stop. Adams v. Williams, 407 U.S. 143, 146-47, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)
 
 
 [76]
 The RICO conspiracy count charged that it was agreed that Grant "would organize, command and maintain a group of individuals known as 'Chip's Army' to provide armed security" during smuggling operations and that he "would maintain an arsenal of handguns, high powered rifles, ammunition, hand grenades, smoke grenades and night scopes for use by his 'Army.' "
 
 
 [77]
 See United States v. Mendenhall, supra, 446 U.S. at 557-58, 100 S.Ct. at 1878-79 (1980); United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); United States v. Goldstein, 635 F.2d 356, 363 (5th Cir. 1981); United States v. Allison, 616 F.2d 779, 782-83 (5th Cir.) cert. denied, 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1980)
 
 
 [78]
 See Schneckloth v. Bustamonte, supra, 412 U.S. at 226-29, 93 S.Ct. at 2047-48; United States v. Hall, 587 F.2d 177, 182 (5th Cir.), cert. denied, 441 U.S. 961, 99 S.Ct. 2405, 60 L.Ed.2d 1065 (1979)
 
 
 [79]
 See, e. g., United States v. Webb, 633 F.2d 1140, 1142 (5th Cir. 1981); United States v. Petty, 601 F.2d 883, 889 (5th Cir. 1979), cert. denied, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980)
 
 
 [80]
 See United States v. Mendenhall, supra, 446 U.S. at 558-59, 100 S.Ct. at 1879-1880
 
 
 [81]
 See id., 446 U.S. at 558, 100 S.Ct. at 1879; Schneckloth v. Bustamonte, supra, 412 U.S. at 226, 93 S.Ct. at 2047
 
 
 [82]
 United States v. Hall, 565 F.2d 917, 921 (5th Cir. 1978)
 
 
 [83]
 We recognize that Myers' counsel objected generally to the witness Jiminez's testimony concerning coconspirator hearsay statements. Myers' counsel complained that many of the statements were after the fact statements, i. e., statements made about past events that were in no manner statements made in furtherance of the conspiracy. Myers objected to certain statements made in December 1977 concerning him. The trial court observed it would need to determine the purpose of each statement at the time it was made in order to determine whether that particular statement was made in furtherance of the conspiracy. Myers' counsel's objection to the conversations, in its totality, was overruled. We discern no error in the trial court's ruling
 
 
 [84]
 A non-constitutional error is harmless if it can fairly be said that it had no effect on the verdict, Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 1247-48, 90 L.Ed. 1557 (1946); errors of constitutional magnitude do not require reversal if harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The admission of inadmissible hearsay does not automatically assume constitutional proportions, although arguably it violates the confrontation clause. United States v. Castillo, 615 F.2d 878, 883 (9th Cir. 1980). In the present case, we conclude that regardless of which harmless error standard of review we apply, the error was harmless
 
 
 [85]
 The first time Jiminez offered to submit to a polygraph examination, Meinster's counsel retorted "We endorse that, Your Honor." No request was made for a curative instruction or mistrial. On the following day, Jiminez asked Meinster's counsel "Why don't you give me a polygraph test?" to which counsel responded "I would love to, Mr. Jiminez." Meinster's counsel, joined by other defense counsel, then moved for a mistrial on the basis of the references to polygraph examinations
 
 
 [86]
 Rule 404(b) provides that evidence of other offense is not admissible except to prove, inter alia, motive, opportunity, interest, preparation, plan, knowledge or identity. Extrinsic offense evidence is admissible if it is relevant to an issue other than the defendant's character, and its probative value is not substantially outweighed by its undue prejudice. United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)
 
 
 [87]
 MR. SCHROEDER: Is it any wonder that these men have become Government witnesses, cooperating witnesses, and testified against them in this trial? Wouldn't you if you were in their position?
 THE COURT: I sustain that objection.
 MR. SCHROEDER: Ladies and gentlemen, I submit to you the thing that makes these seven men so reprehensible to the defense counsel is that they have the audacity to come in the courtroom and testify truthfully and candidly against the real criminals.
 
 
 [88]
 See the first comment in the preceding footnote
 
 
 [89]
 MR. SCHROEDER: * * *
 Ladies and gentlemen, in conclusion, we say that Mr. Brown, Mr. Biehl and I have spent several months laying the ground work of this case.
 MR. G. KOGAN: Objection. That is improper, also, as to what he and Mr. Brown and Mr. Biehl did over several months.
 THE COURT: Yes, it is. So was the earlier comment about some of the defense counsel, that they worked on it for many months.
 MR. G. KOGAN: He is laying ground work and I say that is improper.
 MR. SCHROEDER: That was argued repeatedly, to make a certain point, that they continued to make during the course of the closing arguments for the defense.
 THE COURT: Yes. Well, of course, it is not in the record and it was improper then and now. I am just getting to the point where I have to sustain it. I do not know any other way to put it.
 Counsel is limited to the record in this case, this massive record over here, and the facts in this record. I think the reasonable inference is there. I think the jury can conclude all of the lawyers worked hard before they came to court.
 
 
 [90]
 MR. SCHROEDER: * * *
 The time has come, ladies and gentlemen; the time has come for the people of South Florida to retake control of their state.
 MR. D. COGAN: Objection and move for mistrial.
 THE COURT: I will sustain the objection. The argument is supposed to be geared to the record in this case.
 MR. SCHROEDER: Yes, Your Honor.
 Ladies and gentlemen, only you can put an end to the Meinster-Platshorn organization, the organization that is dubbed The Black Tuna Gang. Only you can do that once and for all. That is the power and the authority that you and you alone enjoy. If you do not use that authority properly, then I would submit to you that your fellow-citizens have again been victimized.
 MR. D. COGAN: Objection.
 THE COURT: The jury will disregard the last statement of counsel.
 (MR. SCHROEDER:) I will reiterate, ladies and gentlemen, that only you have the power and the authority to put an end to this organization, based upon the evidence, not the arguments of Mr. Brown, Mr. Beihl or myself, but based upon the evidence, the evidence from that witness stand and that has been admitted formally into evidence.
 
 
 [91]
 See the comments in the preceding footnote
 
 
 [92]
 With one exception, the Government concedes that the remarks were improper. It contends that the comment to "put an end to this organization, based upon the evidence" is not impermissible because the existence of the organization had an evidentiary foundation. We disagree with the Government because the comment suggests that the organization existed at the time of trial although the period covered by the indictment ended well before the trial began
 
 
 [93]
 In reviewing the sufficiency of the evidence, we must view all the evidence, direct and circumstantial, in the light most favorable to the government, and must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. The standard of review is whether a jury could reasonably find that the evidence was inconsistent with every reasonable hypothesis of innocence or, put another way, whether a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt
 United States v. Marx, 635 F.2d 436, 438 (5th Cir. 1981) (citations omitted).
 
 
 [94]
 For a discussion of the elements of § 848, see the double jeopardy section of this opinion, supra at 1012-1014
 
 
 [95]
 One who "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States is punishable as a principal. 18 U.S.C.A. § 2. One who, "knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." 18 U.S.C.A. § 3
 
 
 [96]
 See the discussion of the elements of aiding and abetting in the double jeopardy section of this opinion, supra at 41
 
 
 [97]
 See the discussion of the elements of RICO in the double jeopardy section of this opinion, supra at 1011-1012
 
 
 [98]
 See note 2 supra